## Cassiday *against* M'Kenzie.

It is not a good objection to the competency of a witness, that he believes himself to be interested in the event of the suit, when in fact he is not so.

The acts of an agent or attorney done after the death of his principal, of which he was ignorant, are binding upon the parties.

ERROR to the Common Pleas of *Cambria* county.

John M'Kenzie, administrator of Eli M'Kenzie, deceased, against the executors of Peter Cassiday, deceased. *Scire facias quare executio non.*

The plaintiff gave in evidence the original judgment of Eli M'Kenzie against Cassiday's executors, dated the 4th of April 1837, for $332.78, and a *testatum fieri facias* to Huntingdon county to January term 1838, returned "not executed," *alias testatum fieri facias* to April term 1838, returned "*nulla bona.*" After suggesting the death of the plaintiff on the 3d of October 1839, and substituting his administrator, a second *pluries testatum fieri facias* was issued to December term 1839, which was levied upon defendant's personal property. The court then, at the instance of the defendant, who alleged payment of the judgment, directed the execution to be stayed, and a *scire facias* to be issued by the plaintiff. Letters of administration on the estate of Eli M'Kenzie issued on the 21st of June 1839.

The defendant then gave in evidence the following order :—

*April 5th* 1836.

Mr Peter Casidy please to pay to the bearer Robert Burgoon whatever sum of money the court should make to me as I am not able to come up to court to git it myself and I dont wish you to pay it to John M'Kinsey and the receipt of Robert Burgoon shall be good to you for the same.

ELY M'KINZEE.

N. B. Pay the money to no person but Robert Burgoon.

The defendant then called Robert Burgoon as a witness, who was sworn on his *voir dire* and said : " I do not know whether I am interested or not. When I got this money from Peter Cassiday, I was to keep it for what I had done and was to do for him." The defendant then offered to prove by the witness that the money paid on this judgment was paid to him by virtue of the order. The plaintiff objected to the witness as being incompetent to testify, and the court rejected him, and sealed a bill of exceptions.

The defendant then offered a number of receipts of Robert Bur-

[Cassiday v. M'Kenzie.]

goon for money paid to him on the order, dated 29th of September 1838, 11th of January 1838, 15th of April 1839, 12th of June 1839, 6th of November 1839, 8th of November 1839, and 15th of November 1839, all of which were admitted to be genuine, but objected to on the ground that the payments to Robert Burgoon were not valid or binding upon the plaintiff; and the court rejected the evidence, and sealed a bill of exceptions.

The defendant then offered to prove that Eli M'Kenzie went to the western country in 1836, soon after he gave the order to Burgoon to receive the money; that he was in Cincinnati in January 1839; that at the time he went away he was indebted to Robert Burgoon, and gave him the order to enable him to collect the money for his own use. This was also objected to and rejected, and the court sealed a bill of exceptions.

*Miles*, for plaintiff in error, argued that Robert Burgoon was a perfectly competent witness, and that the money paid to him by Cassiday before his knowledge of the death of M'Kenzie was a valid and binding payment.

*Magehan*, *contra*. The death of the principal is a revocation of his power, and therefore the payments to him were void: and besides, the payments were made after the execution issued, which was notice of the death of the principal.

The opinion of the Court was delivered by

ROGERS, J.—This was a *scire facias* upon a judgment, to which the defendant pleaded payment, and for the purpose of supporting the issue, after proving the execution of the instrument by the subscribing witness in due and proper form, gave in evidence the following order, (see statement of the case), and then offered Robert Burgoon as a witness to prove, that in pursuance of the order he paid to him at divers times certain sums of money in payment of the debt. Being sworn on his *voir dire*, he says, " that he does not know whether he is interested or not. When he got this money from Peter Cassiday, he was to keep it for what he had done and was to do for Eli M'Kenzie." The court excluded the witness, but upon what ground I am at a loss to imagine; that is, whether because he was interested, or because he thought himself so. Whatever may have been the diversity of opinion on the latter point, it has been put at rest in this State; for it is no objection to the competency of a witness that he believes himself to be interested in the event of the suit, when in fact he is not so. *Long v. Bailie*, (4 *Serg. & Rawle* 222). The objection goes to his credit, but does not affect his competency; so that the inquiry is, not whether he thought himself interested, but whether he was interested in the event of the suit trying. Had he then an interest in the event of the suit? He is offered as a witness for the debtor

[Cassiday v. M'Kenzie.]

against his principal to prove that he received the money, and the effect of his testimony is to *charge*, not to discharge himself, so that in truth he is swearing against his own interest. It will not be denied that his declarations and his receipts are evidence against the principal; and it would be difficult to assign a reason why his testimony on oath shall not also be received. But it seems that the witness says, that when he got the money from the defendant, it was the understanding that he was to receive it for his own use. But admitting it be so, what is that to the purpose? Does it make him interested in the event of this suit? Suppose it results in a verdict for the defendant, could it be given in evidence in a suit which may be hereafter brought by the present plaintiff against the w? It clearly could not, except to charge him; but this woul██ ██ ██ainst his interest. There is nothing in which it could benefit . He stands indifferent between these parties, for, result as it may, he is exposed to a suit as the recipient of money to which it is alleged he is not entitled, except as agent. For if he was not the agent, and the defendant is compelled to pay the money again, he may recover it back from the witness; and if he was the agent, he is liable to a suit by the administrator of Eli M'Kinley, as for money had and received for his use. In that suit the title to the money may be tried, but it cannot by any possibility be tried in this. If the money is his, he may show it; but this cannot be done by his own declarations, or anything which he may prove in this suit; for whether it be his money or the money of his principal, is a matter totally indifferent to the present defendant.

But it has been insinuated rather than urged, that an execution, having been issued by the attorney after the date of the order, is a revocation of the authority to the agent. Whether the execution was issued by the command of the principal or the agent does not appear, nor is it very material that it should; for without entering into the question whether the attorney on the record would have been justifiable in paying it to Burgoon, we are of the opinion that it would be a good payment, whether made to the attorney or the agent.

But, finally, it is contended that a payment, after the death of the principal, is not good. It is conceded that the death of the principal is *ipso facto* a revocation of a letter of attorney. But does it avoid all acts of the attorney intermediate between the death of the principal and notice of it? In *Salte* v. *Field*, (5 *Term Rep.* 214), Mr. Justice Buller observes, " It has been questioned with respect to an agent acting under a power of attorney, whether acts done by him before he knows of the revocation of his warrant, are good against the principal; and it seems that the principal in such case could not avoid the acts of his agent, done *bonâ fide*, if they were to his disadvantage, though he might consent to avoid such as were for his benefit." And in *Hazard* v. *Tread-well*, (*Str.* 506); 12 *Mod.* 346, it is ruled, that the credit arising

[Cassiday v. M'Kenzie.]

from an ostensible employment continues at least with regard to those who have been accustomed to deal on the faith of that employment until they have notice of its being at an end, or till its termination is notorious. And these are principles founded on the most obvious justice. Thus, if a man is the notorious agent for another to collect debts, it is but reasonable that debtors should be protected in payments to the agent until they are informed that the agency has terminated. But this, it is said, is only true of an agency terminated by express revocation, and does not hold, of an implied revocation by the death of the principal. It would puzzle the most acute man to give any reason why it should be a mispayment when revoked by death, and a good payment when expressly revoked by the party in his lifetime.

In *Watson* v. *King*, (4 *Camp.* 272), however, it is ruled that a power of attorney, *though coupled with an interest*, is instantly revoked by the death of the grantor; and an act afterwards *bonâ fide* done under it by the grantee before notice of the death of the grantor is a nullity. Lord Ellenborough says, a power coupled with an interest cannot be revoked by the person granting it; but *it is necessarily revoked by his death.* How can a valid act be done in the name of a dead man?" It will be observed that the reason is purely technical. How can a valid act be done in the name of a dead man? And it might with as much propriety be asked, how can a valid act be done by an agent whose authority is revoked by his principal?

But notwithstanding the opinion thus confidently expressed, it is now an admitted exception that where the power or authority is coupled with an interest in the thing actually vested in the agent, then an act done by him after the death of his principal is good. And the reason given by Chief Justice Marshall in *Hunt* v. *Rousmanier*, (8 *Wheat.* 174), is, that the agent, having the legal title in the property, is capable of transferring it in his own name, notwithstanding the death of the principal; and the death of the principal has no operation upon his act. The power given by the principal is, under such circumstances, rather an assent or agreement that the agent may transfer the property vested in him, free from all equities of the principal, than strictly a power to transfer. The whole reasoning of the court, in *Hunt* v. *Rousmanier*, shows their anxiety to rid themselves of the absurdity into which a strict adherence to the principle that death is a revocation of a power, would lead them. Why not place it on the rational ground, that although the conveyance would be bad at law, yet it would be good in equity when made *bonâ fide* without any notice whatever of the death of the principal. But be this as it may, the principle does not apply here. There is no act to be done. This money has been paid by the debtor and received by the agent in good faith; and why should it not be good when the authority is revoked by death, as it confessedly is when expressly revoked by the principal

[Cassiday v. M'Kenzie.]

in his lifetime? Here the precise point is, whether a payment to an agent when the parties are ignorant of the death is a good payment. In addition to the case in *Campbell* before cited, the same Judge, Lord Ellenborough, has decided in 5 *Esp.* 117, the general question that a payment after the death of principal is not good. Thus, a payment of sailor's wages to a person having a power of attorney to receive them, has been held void when the principal was dead at the time of the payment. If, by this case, it is meant merely to decide the general proposition that by operation of law the death of the principal is a revocation of the powers of the attorney, no objection can be taken to it. But if it is intended to say that this principle applies where there was no notice of death, or opportunity of notice, I must be permitted to dissent from it.

In addition, it is contrary to the opinion of Lord Loughborough in *Tate* v. *Hilbert*, (2 *Vez. Jun.*), where, on a question whether a check given by a dying person to a relation, but not presented in his lifetime, could be enforced as *donatio causâ mortis* against the executor, he said, if the donee had received the money upon the check immediately after the death of the testator, and before the cashier was apprised of it, he was inclined to think no court would have taken it from him. And what would he have said if the attempt had been made to subject the banker, when he was ignorant of the death? But, if this doctrine applies, why does it not apply to the case of factors, foreign or domestic, to commission merchants, to supercargoes, and masters of ships, and to various other agencies which the necessities of commerce may require. In the case of a foreign factor, for example, has it been supposed that his acts, after this implied revocation of authority, are void? Cases of this kind must often have occurred, and it would astonish the mercantile world to be informed that the factor was liable on a contract made in the name of his principal because he was dead, a fact of which he was ignorant, and of which he could not by any possibility be informed, or that the merchant who was trusting his goods on the credit of the principal was to be cast on him who may have been of doubtful solvency, for payment. Can it be, that a payment made to an agent from a foreign country, and from one of our cities to the western States, employed for the special purpose of collecting debts, is void because his principal may have died the very day before the actual receipt of the money? That a payment may be good to-day or bad to-morrow from the accidental circumstance of the death of the principal, which he did not know, and which by no possibility could he know? It would be unjust to the agent and unjust to the debtor. In the civil law, the acts of the agent, done *bonâ fide* in ignorance of the death of his principal, are held valid and binding upon the heirs of the latter. The same rule holds in the Scottish law, and I cannot believe the

[Cassiday v. M'Kenzie.]

common law is so unreasonable, notwithstanding the doubts expressed by Chancellor Kent in the 2d volume of his Commentaries, 646.

These principles dispose of all that will be material on another trial.

Judgment reversed, and a *venire de novo* awarded.