TRAVERS *v.* CRANE, Administrator of Gray *et als.*

DEATH of the principal revokes the authority of the agent, and a deed of land made by him after such death, does not bind the representatives of the principal.

But if the agent has a power coupled with an interest, that is, a power which conveys to the agent an interest in the property, then the execution of the power after the death of the principal, is good.

If, on an executory contract for the purchase of land made by plaintiff with the agent during the life of the principal, money due the principal was paid, after his death, to the agent, who settled the amount with the estate, so that the estate received the benefit of the payment, plaintiff would be entitled, in equity, to call for the legal title, and could defend in ejectment by the representatives of the principal.

Where the respondent takes no appeal—at least, where he files no transcript and assigns no errors—the judgment will not be reversed at his instance.

APPEAL from the Twelfth District.

Bill filed against Crane, as Administrator of Franklin C. Gray, deceased, Matilda C. Gray, his widow, F. C. Gray, the son, and Eaton, to enjoin Crane from proceedings at law against plaintiff, to recover certain real estate in San Francisco, to confirm a deed by Eaton, as attorney of Gray, to plaintiff, and to compel a deed from defendants to plaintiff.

The executory contract mentioned by the Court, being lost, plaintiff proved it by a witness, who stated that plaintiff brought him a receipt in writing from Eaton in effect, that Eaton, as the attorney of Gray, had sold to Travers the property described for $8,500, $500 cash on the signing of the receipt, $5,000 when the deed was made out and signed, if the title was satisfactory, and the balance in a very short time, one, two or three months, more or less.

Travers *v.* Crane.

On cross-examination the witness said, "The contract was about a half page of foolscap; it was not exactly a receipt; as near as I recollect it said, 'I hereby, as the attorney of F. C. Gray, sell and convey all the right, title and interest of said Gray to said Travers, to certain portions of fifty vara lot so and so, (I do not recollect the number) at corner of Kearny and Broadway, for so much money, and so many more dollars, to be paid at a certain day, and the balance in a certain time.' " He also proved the subsequent payments and conveyance.

The Court below decreed that the injunction previously granted, restraining Crane from prosecuting the suit at law, be continued until the further order of the Court, to enable plaintiff to proceed in the Probate Court for a specific performance of the contract alleged in the complaint. Plaintiff appeals.

*McDougall & Sharp*, for Appellant.

1. The insufficiency of the *agreement*. It is only necessary to refer to the terms of the *written* contract of sale as proved by McHenry, to dispose of this point. It speaks for itself, and operates a sale *in presenti*, and what is more, so far as this case is concerned, a complete conveyance in equity. According to the rule in equity, the land passed to Travers, or *became the right of Travers; the money, the right of Gray.* We are now asking the aid of a Court of Equity, and the application of its rules.

2. If the foregoing position be correct, no question of part performance is involved. We are not claiming under a parol, but under a written contract, and we are not within the statute of frauds. Yet upon the facts, were this only a parol contract and not such an agreement as is required by the statute of frauds, the contract of sale would be enforced.

3. In demanding the *legal estate*, as distinct from the equitable right, the only question is the question of performance by Travers. Has he done equity so that he may claim the aid of equity? Has he paid the price?

It will not be denied that, according to the most ancient and technical rule of *the common law*, the power of an attorney ceased with the death of his principal—both as to his power to convey an estate, and as to his power to grant an acquittance upon the payment of money.

This rule was, however, subject to the exceptions stated by Parsons, vol. 1, p. 61. "The death of a principal operates *per se* a revocation

of the agency.   *But not if the agency is coupled with an interest vested in the agent.*   Then it survives, and the agent may do all that is necessary to realize the interest."

By reference to the text of Parsons, it will be seen that the right continues in the attorney, and can always be executed by him when he can perform the act in his own name.   When he cannot perform the act in his own name, the right continues in him, and he can compel the representatives of the deceased to execute the power.   The text and note are clear upon this point.

It is clearly in proof that the attorneyship of Eaton was coupled with an interest.   He was one-fourth partner in the property, and had the right to sell and enjoy one-fourth of the proceeds.   His legal power over the property for purpose of conveyance might cease upon the death of Gray, for the *technical* reason only, that Gray, the nominal grantor, could not act, but his complete right continued, and that is all that we require to maintain our proceedings in equity.

We say the old technical rule of the common law was that the power ceased with the death of the principal.   The rule was the same in the civil law, but there we find *the exceptions stated.*   " The acts of the agent done *bona fide* in ignorance of the death of.his principal, were held valid and binding on the heirs of the latter."   (Story's Agency, secs. 491, 495.)   The same rule has been adopted as the rule of commercial law, in continental Europe.   Id. sec. 49 ; see also Id. sec. 488, note 4.)

The opposite counsel cite Parsons 1, p. 61, as holding a rule in opposition to the current of authority ; but upon examination it will not be found that any of the cases cited meet the present question, except 2 Hump. 350, which is a short and evidently not carefully considered opinion, while *Cassiday* v. *McKenzie,* (4 Watts & Serg. 282) upon which we rely, is a full, learned and logical discussion of the question, both upon principle and authority.

Indeed, no stronger authority in favor of the soundness of our position can be cited than *Smout* v. *Ilbery,* (10 Mees & W. 1) in which it is held that the agent is not liable where he acts in good faith without knowledge of the decease of the principal, and according to which authority Eaton is not bound to us.

But Eaton was attorney and he was partner.   In equity the rights of the partnership were converted into personalty by the agreement to sell.   Travers owed a debt to Gray and Eaton, which debt Eaton

Travers *v.* Crane.

could acquit, and if the deed was not well executed, over that equity has power.

We insist, that

1. Upon the ground that the payment was made in good faith to the attorney before the decease of principal could be known, that the payment was sufficient.

2. Upon the ground that Eaton was an attorney coupled with an interest, that the payment was sufficient.

3. Upon the ground that Gray and Eaton were partners in the debt due from Travers, that the payment was sufficient.

*Wm. W. Crane, Jr., pro. per.*

1. I assume as the first proposition, that the plaintiff, to maintain his action, must prove a complete, unequivocal agreement, mutual and binding upon Gray at the period of his death. (*Benedict* v. *Lynch*, 1 John Ch. 356; *Lady Thyne* v. *Earl of Glengall*, 2d House of Lords' Cases, 131.) The evidence does not disclose such an arrangement.

Again, when the agreement was completed, the fee had passed to Gray's heirs, and the action of the plaintiff should fail, because his (Gray's) agreement is not proven. (*Graham* v. *Call's Executors*, 5 Munf. 396; *Bromley* v. *Jefferies*, 2 Vern. 415.)

If it be true that the memorandum amounted merely to a promise on the part of Gray to convey, without an obligation on the part of Travers to take, then the latter, to sustain his position, must prove an entry into possession, and the expenditure of money in improvements upon the faith of the promise. The rule in this respect is stated by his Hon. Judge Field, in *Arguello* v. *Edinger*, (10 Cal. 150).

2. Upon the facts arises the question, whether a payment after the death of the principal to the agent, is a payment to the representatives or heirs at law of the principal? The whole current of authority is against the proposition. (*Wallace* v. *Cook*, 5 Esp. R. 117; *Watson* v. *King*, 4 Camp. 272; *Smout* v. *Ilbery*, 10 Mees & W. 1; *Hunt* v. *Rousemairer Administrator*, 8 Wheat. 171; *Clark* v. *Richards*, 3 E. D. Smith, 89.)

The general principle of the common law in relation to this matter, seems to be, that a power coupled with an interest is irrevocable, even by death of the principal. To constitute this power there must be an interest in the thing itself, and not merely in the execution of the power. When the agent has an interest in the thing itself, the power

is executed either in the name of the principal or agent. (Story on Agency, sec. 164; 2d Kent Com. 647, note *a;* 1 Parsons on Contracts, 60, note 4.)

BALDWIN, J. delivered the opinion of the Court — COPE, J. concurring.

The plaintiff filed this bill to enjoin proceedings at law on the part of the defendants, to recover certain real estate in San Francisco. The foundation of the plaintiff's (appellant's) claim to equitable relief is, that he made an executory contract in July, 1853, with one Eaton, who was then the attorney in fact for Gray, by the terms of which, he was to pay some one hundred dollars in cash, and a further sum in a few months; a memorandum of the agreement was made at the time. The one hundred dollars was paid, and the defendant, shortly afterward, let into possession, which he has since retained. Afterward, on the sixteenth day of July, 1853, he paid to Eaton the balance of the purchase money, and obtained from him a deed in the name of Gray. At the time of the first contract, Gray was in the Atlantic States; Eaton and plaintiff were in San Francisco. Gray died the day before the last payment, and the execution of the deed. The death of Gray was, of course, unknown to the plaintiff or Eaton at this last date, and the payment was made in good faith.

The main question is as to the effect of this payment to the attorney after the death of the principal. We state the proposition in this simple form, because the facts of this case do not authorize the qualifications which are made in the appellant's argument.

Undoubtedly it is a hard rule, to hold that the death of a principal, who has, by authentic act, given to another a power to represent him in a particular transaction, should have the effect of defrauding an innocent third person of his money, when usual, and even extraordinary prudence could not avail to protect him. And the civil law, in this respect, seems more reasonable than ours; for that system, while it recognized the general rule, that a mere power expired by the death of the principal or agent, annexed this qualification, that the acts of the agent, done *bona fide,* in ignorance of the death of his principal, were held valid and binding upon the heirs of the latter. (Story on Agency, p. 636.) This principle seems to have been adopted into the commercial jurisprudence of the modern nations of continental Europe; and Mr. Story adds, that similar principles will be found adopted into

Travers *v.* Crane.

that of Scotland. And so just is the principle, that two of the States of the Union have adopted it by Legislative Act. (2 Kent 647, note *a.*) The case of *Cassiday* v. *McKenzie* (4 Watts & S. 284) is the only case to which we have been referred, where it has been decided—if such be the decision—that the payment of money to the agent after the death of the principal is good. But however strong the reasoning of that case may tend in this direction, it is proper to remark that it was not necessary there so to hold. The facts of that case were, that one McKenzie drew an order on Cassiday, to pay the bearer, Robert Bayoon, a sum of money. This sum was paid after the death of the drawer. But the witness, Bayoon, testified, that the money was, by agreement, coming to him. The order itself purported to be an equitable assignment of the debt, and not a mere agency to receive money for another; and certainly, in connection with this proof of ownership by the witness, authorized him to receive the debt. The opinion, therefore, of the learned Judge may be regarded more as an extrajudicial indication of his views on the general subject, than as the adjudication of the Court upon the point in question. But according all proper weight to this opinion, as the judgment of a Court of great respectability, it stands alone among common law authorities, and is opposed by an array too formidable to permit us to follow it. It is true, that Mr. Justice Story (on Agency, sec. 495) uses this language, which is cited by the learned counsel for the appellant: " Reasonable as these doctrines (of the civil law) seem, and convenient as they must be admitted to be for the practical purposes of trade and commerce, it has been thought that they do not prevail at common law, as recognized either in England or America. But it may be doubted whether our law deserves such a reproach, at least to the full extent in which it is usually imputed to it." But the next sentence explains what this learned jurist meant to say in this cautious extract: " Regularly, indeed, where the act to be done must be done in the name of the principal, and not in that of the agent; the authority is extinguished by the death of the principal, because it has then become incapable of being so executed; " and he proceeds to say, " Where the act, notwithstanding the death of the principal, can and may be done in the name of the agent, there seems to be a sound reason why his death should not be deemed a revocation under all circumstances, and that a subsequent execution of it may be valid; but where the act is required to be done in the name of the principal, the same objection would seem to

Travers v. Crane.

lie to it in the foreign law as does lie in our law.   Now our law requires this distinction in its fullest force."

Parsons on Contracts (p. 61) lays down the doctrine broadly : " The death of the principal operates *per se* a revocation of the agency.   But not if the agency is coupled with an interest vested in the agent.   Then it survives, and the agent may do all that is necessary to realize his interest and make it beneficial to himself.   Nor is such agency revocable at the pleasure of the principal in his lifetime; and if the agent dies, it passes over to his representatives.   It is, in such case, an important, if not a decisive question, whether the act authorized could be performed by the agent in his own name or only by him as an agent, and in the name of the principal.   In the first case, if an interest were coupled with the agency, the authority would survive the death of the principal, and the agent might perform the act in the same manner after the death as before.   In the latter case, as he could no longer use the name of the principal, for the obvious reason that one who is dead *can no longer* act, it would seem that his right must be limited to that of requiring the representatives of the deceased to perform the act necessary for his protection."

Kent ( 2 vol. Com. Marg'l 646) is not less explicit.   That eminent writer says : " The authority of an agent terminates by the death of his principal ; and a joint authority to two persons terminates by the death of one of them.   This is the general doctrine.   By the civil law, and the law of those countries which have adopted the civil law, the acts of an agent done *bona fide* after the death of the principal, and before notice of his death, are binding on his representatives.   But this equitable principle does not prevail in the English law ; and the death of a principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest." The current of authority is to the same effect.   (*Hunt* v. *Rousemairer*, 8 Wheat. 174; 6 East. 356; 4 Camp. p. 272 [which probably goes too far] ; 2 Greenleaf R. 14; 1 Caine's Cases in Error, 1 ; 6 Espinasse R.; 10 Meeson & W.; 3 E. D. Smith.)

The technical reason on which this doctrine rests is very strong—the solecism, namely, of a dead man acting by attorney, and the existence of an attorney where there is no principal.   The argument of Justice Rogers, in 4 Watts & Serg., in reply to Lord Ellenborough's interrogatory in 4 Campbell—" How can a valid act be done in the name of a dead man ?"—is more specious than sound.   The learned Justice asks,

Travers *v.* Crane.

how can there be an attorney after his power is revoked? But the ready answer is, that the attorney was constituted before the revocation, and it is the fault of the principal that notice of the revocation is not given; and, by a familiar principle of estoppel (analogous to that governing partnerships) the principal is not permitted, as against a man dealing with the agent by his own act, to deny his character; but, in the case of the death of the principal, there is no one in being to be estopped or bound. But whatever may be the reasonableness or unreasonableness of the rule, it is too firmly established to be overturned by the Courts.

2. We have not overlooked the point made by the counsel for the appellant, that it was in proof Eaton was a partner of Gray, and therefore had an interest in the lot sold; and hence he is brought within the exception that the execution of the power by the agent, after his principal's death, is good when the agent has an interest in the property. But the conclusive answer is, that the bill does not set up any fact of this nature. It rests upon the mere ground of general and ordinary agency, so far as this matter goes; and proof without corresponding allegation does not help. But we are by no means convinced that the case would be altered if this allegation had been made. The meaning of this exception is a power coupled with an interest in the subject—that is to say, a power *which conveys to the attorney an interest in the property.* The reason of the exception is, that the death of the principal cannot affect an act of the agent, which act the agent could do whether the principal lived or died. Here the contract and sole authority came from the principal—the legal title is in him. The agent is not sought to be held, but the heirs and representatives of the deceased. If, by mere force of this alleged partnership, Eaton could sell for himself and Gray, the facts should have been stated, if this claim for relief was insisted on, so as to put this matter directly in issue. But the bill makes no such case.

3. Nor can the bill be sustained on the ground that, really, the money had been paid into the estate. If it had been shown that this was a good executory contract with Gray's attorney during Gray's lifetime; that so much money was due on this contract to Gray in his lifetime; that, after his death, it was paid to his former agent, who settled the amount with the estate in such a manner that the estate got the benefit of the payment, we do not see why, in equity, this would not be a fulfillment of the contract of the plaintiff, and entitle him to call

Travers *v.* Crane.

for the legal title.    But, though this is asserted in the bill, it is, at least so far as the $5,000 is concerned, denied in the answer, and we see no proof of the averment.

4. The case of the plaintiff, it seems to us, is not so hard as the counsel intimates.    If he paid over the money to Eaton, and Eaton has not settled with the estate, Eaton would be responsible and compelled to refund the money.    If the money were paid to the estate, then the plaintiff could defend in ejectment on a good equitable title.    If he had paid a portion of the purchase money, but not all (in consequence of this litigation and the causes of it) probably a Court of equity would not debar him from paying the balance yet unpaid, and insisting on the performance of the contract first made, and enforcing a specific execution.    But upon the case as it stands, we must affirm the decree, without prejudice to any future proceedings which the plaintiff may be advised to take in pursuance of the principles herein indicated.

On a petition for modification, BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

We are asked by the counsel of respondent to modify the opinion and judgment of this Court, so as to reverse the decree of the Court below, instead of affirming it as we did.    But no appeal seems to have been taken by the respondent; at least, no transcript is presented by him, and no errors assigned.    We can therefore, only consider the errors assigned by the appellant.    But we apprehend that the object of the respondent can be obtained in another way.    The decretal order of the District Court only directed an injunction until its further order. This was in the nature of an interlocutory order, which it was within the power of the Court to set aside on a proper proceeding.    The opinion of the District Judge is no part of his decree.    Of course, upon the rehearing or motion of the respondent to dissolve the injunction, the District Court would be governed by the principles of the opinion heretofore delivered.    Motion refused.