## CATLIN v. REED et al.

No. 19103. Opinion Filed Nov. 12, 1929.

Rehearing Denied Jan. 7, 1930.

Commissioners' Opinion, Division No. 1.

Kirshner, House, Stroheker & Bennett and McKeown & Green, for plaintiff in error.

Rainey, Flynn, Green & Anderson and Roberts & Jones, for defendants in error.

TEEHEE, C. Presented by this appeal is the single question of agency. It arises out of a mortgage foreclosure action.

The suit was brought on October 29, 1924, by plaintiff in error, Mary R. Catlin, against Frank H. Reed and Isabelle S. Reed, principal defendants and defendants in error here, and Eulah Mae Reed, Raymond Reed, a minor, and the receivers for the Conservative Loan & Trust Company, nominal defendants, who are not parties on appeal.

Plaintiff's petition was in the usual form in such cases, and alleged ownership of the note sued on by virtue of a bequest of the holder. Defendants pleaded payment of the note to plaintiff's agent, the Conservative Loan & Trust Company.

The facts out of which the litigation arose, admitted or tended to be established by the evidence, substantially are as follows:

On July 10, 1913, Ray W. Reed made a five-year loan of $1,500 from the Conservative Loan Company of Shawnee, Okla., and in security thereof gave a mortgage on certain real property. Thereafter, on July 28, 1913, the note and mortgage were assigned to one Henry Richings of Rockford, Ill. At the time of making the loan the mortgagor was a single man. Shortly thereafter Ray W. Reed died. He was survived by his wife, Eulah Mae Reed, and a child, Raymond Reed. His brother, Frank H. Reed, who lived at Tulsa, took over the mortgaged premises and assumed the loan thereagainst. He paid the maturing interest coupons to the loan company. These interest payments were by the loan company remitted to W. W. Bennett & Company at assignee's address. The canceled interest coupons were delivered to the payer by the loan company. The loan matured on June 1, 1918. By letter dated April 4, 1918, the Bennett Company, by W. W. Bennett, advised the loan company, of which he was an officer, that the owner of the loan note and mortgage would grant a five-year extension of the loan. The loan company sent its representative to see Reed relative to renewal of the loan. Renewal was consummated by the loan company's representative. The extension agreement acknowledged Frank H. Reed's indebtedness under the original note to the holder, Henry Richings. The original note was treated as the renewal note. This was payable at the loan company's office at Shawnee. Annual renewal interest coupons and the extension agreement were signed by Frank H. Reed, and his wife, Isabelle S. Reed. The interest coupons were made payable to Henry Richings or bearer at the loan company's office at Shawnee. The first four interest coupons were paid to the loan company at its office, which payments were by it handled as in the case of such payments made prior to the extension agreement.

On April 24, 1923, the loan company, then styled the Conservative Loan & Trust Company, by letter to Frank H. Reed, called attention that the loan with the last interest item would be due on June 1st, and desired to know whether he would want to renew the loan or pay the same at maturity. On May 4, 1923, Reed replied requesting to be advised of the terms under which a renewal might be made. On May 8th the loan company, by letter, answered to the effect that a renewal may be secured on a base rate of 6 per cent. with 1½ per cent. commission per annum, if the commission be paid in cash, and that they hoped to be able to renew the loan for him. In response to that letter Frank H. Reed called at the office of the loan company at Shawnee, and failing to agree upon terms of renewal, by check dated May 26, 1923, he paid to the loan company the principal and the final interest coupon aggregating $1,590. At that time he requested the original instruments. The loan company informed him that the same would be forwarded to him in a few days. All notices in relation thereto, both with respect to the original and renewal loans, were received by him from the loan company. On June 25, 1923, Frank H. Reed wrote the loan company to the effect that the note, release, abstract, etc., which it promised to forward to him, had not been received, and wished to be advised of the cause of delay, as he had understood that the company was in possession of the loan papers.

In July, 1923, the loan company failed, and receivers took charge thereof. The books of the loan company showed that the loan payment was entered to the credit of W. W. Bennett & Company.

On December 12, 1922, Henry Richings died. By his will the loan note and mortgage were bequeathed to his daughter, Mary R. Catlin. The daughter, on January 19, 1923, was appointed executrix of her father's estate. By court order on March 14, 1924, she assigned to herself the loan instruments.

About the latter part of August, 1924, Mary R. Catlin filed with the receivers for the loan company a claim for the amount of the Ray W. Reed loan for which the loan company was indebted to her, and that the same was owing on the 13th day of June, 1923. In this claim it was stated that she did not intend to release or relinquish the mortgage security, and reserved the right to sue upon such security. To the time of the filing of the suit, the payer had no notice of Richings' death.

The case was tried to the court without the intervention of a jury. Upon the facts as above narrated, enlarged upon by detail of witnesses and by record matter, the court found payment of the loan by the defendants as alleged by them, and thereupon rendered judgment that plaintiff take nothing by her suit.

Plaintiff contends:

"First: That there is no evidence that the Conservative Loan & Trust Company was the agent of Henry Richings or of Mary R. Catlin.

"Second: That the death of Henry Richings terminated any purported agency relationship now asserted to have existed between Henry Richings and Conservative Loan & Trust Company."

It is the settled rule that the question of agency and the scope and extent of the agents' authority are to be gathered from all the facts and circumstances in evidence, and are to be determined either by the jury or the court as a trier of fact. Loveland v. Loafman, 92 Okla. 133, 218 Pac. 851; Federal Intermediate Credit Bank v. Cosby, 134 Okla. 1, 272 Pac. 436.

In the state of the evidence, the case presented is brought within the rule that payment of negotiable paper before maturity to a person other than the holder thereof, or his duly authorized agent to receive payment, is at the risk of the payer, and that where payment is made to one not in possession of the paper, the payer has the burden to establish the authority of such person to receive payment. Lind v. Smith, 128 Okla. 292, 262 Pac. 663; Weiser v. Doerksen, 136 Okla. 57, 276 Pac. 224.

It is also a rule of judicial recognition that an indorsee of negotiable paper, by his conduct or manner of dealing in relation thereto, may fairly indicate the authority of the original payee to receive payment of the paper without possession thereof, or induce in the mind of the payer a reasonable and justifiable belief that the original payee

has such authority. Quinn v. Dresbach, 75 Cal. 159, 16 Pac. 762, 7 A. S. R. 138; Thomson v. Shelton, 49 Neb. 644, 68 N. W. 1055; Campbell v. Gowans, 35 Utah, 268, 100 Pac. 397, 19 Ann. Cas. 660, 23 L. R. A. (N. S.) 414; 21 R. C. L. 23, paragraph 17. That rule rests upon the time-honored principle of estoppel by conduct.

It not appearing from the evidence that the loan company was in the possession of the paper at the time of payment, or had express authority in that premise, the sufficiency of the payment made by defendants to the loan company must turn on the conduct of the holder of the note in respect to his dealings thereto with the loan company, the original payee. In other words, the question is, Did the loan company have ostensible authority to receive the payment? If so, the judgment must be affirmed, for, as was said in the Thomson Case:

"Ostensible authority to act as agent may be conferred if the party to be charged as principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to trust and act upon such apparent agency."

The points of the evidence which may be said to have conferred ostensible authority on the loan company to receive payment of the loan in the manner as was done, if at all, rest in the fact that all the payer's dealings in relation to the paper sued on were had with the loan company with the apparent sanction of the holder. In our view, the chief point to which the others contribute such evidentiary value as they may possess—and no one of which, we may well remark, standing alone, would be sufficient in point of law—consists in the fact of the designated place of payment of the note and interest coupons.

As is shown by the evidence, when the defendant Frank H. Reed assumed the obligation, upon periodic notice from the loan company of the maturity of the original interest coupons, payments thereof were made to the loan company, which by it were remitted to the Bennett Company, the directing hand between the holder of the paper and the loan company.

When the extension agreement was entered into, it was the loan company which conducted the negotiations and effected the agreement. The original note was then treated as the renewal note, which was payable at the loan company's office at Shawnee, Okla., with the mortgage securing the same containing a like provision. The renewal

interest coupons were likewise expressly made payable to the holder of the note or bearer at the same place. All renewal papers, we may fairly infer, were forwarded to the holder through the Bennett Company conformably to its letter to the loan company advising that renewal would be agreeable to the holder. This letter contained like advice as to another loan. In conformity with the extension agreement, renewal interest payments were made to the loan company upon notice from that concern and by it handled as theretofore.

When the payer received the letter from the loan company, about a month prior to the maturity of the renewal loan, requesting to be advised if the payer desired to again renew the same or wished to pay the amount thereof at maturity, upon failing to reach an agreement for a further renewal, his action therein by paying the note and last interest coupon to the loan company was no less than any person of ordinary prudence would have done under like circumstances, for in the light of all of the prior transactions in relation to the paper, payer's acts were doubtless induced by the belief that the loan company was again the intermediary from the fact that it had so appeared at the first renewal. There is no intimation in the record that this payment was not made in good faith. In the Quinn Case, it was laid down as a rule of business conduct that:

"Where a person is the agent of another in the commencement of a transaction, and such other is chargeable with knowledge that the first is continuing to act in the matter in some way, the inference which he ought to draw is that the person assuming to act as agent is continuing to act in the same capacity in which he commenced, and it is negligence not to repudiate the agency."

The cases are legion, of course, to the effect that the fact that negotiable paper is made payable at a designated place of business or office does not of itself make the person in charge of such place the agent of the holder. State National Bank v. J. J. Hyatt Co., 75 Ark. 170, 112 A. S. R. 50, 86 S. W. 1002, 5 Ann. Cas. 296. Yet, taking the place of payment of the paper involved in this litigation as the pivitol point supported by the course of dealings had between the payer and the holder through the loan company without protest on the part of the holder, it is not difficult to see that the payer acted upon a reasonable and justifiable belief that the loan company had the authority to receive payment of the note and last interest coupon at its office, as provided therein, though at the time it did not have in its possession the loan papers. It has been so held. Wolford v. Young, 105 Iowa, 512, 75 N. W. 349; Chapman v. Wagoner, 1 Neb. (Unof.) 492, 96 N. W. 412; Fowler v. Outcalt, 64 Kan. 352, 67 Pac. 889.

The principle applicable to the cause at bar is contained in the syllabus to the Wolford Case, to wit:

"A vendor of land who has the note and mortgage given for the purchase price made payable at the office of an investment company at which a note and mortgage for other land previously sold to the same purchaser had been made payable, and to which company payment was duly made and forwarded by it to the vendor, cannot recover from the purchaser for money paid to such company on the second note and mortgage, although it is not forwarded to the vendor, and it did not, at the time of receiving the payment, have the note and mortgage. Especially when payment to such agent was not for the payer or his convenience, and where the agency, if not wholly needless, was used for the convenience of the payee."

That action was brought by the mortgagor for the cancellation of the note and mortgage involved therein on the ground that the same had been paid to the agent of the holder. The holder denied such payment and sought foreclosure of the mortgage. Judgment went for the plaintiff. The rule relied on by defendant on appeal was that as stated in the Lind and Weiser Cases above cited. The observation of the court in that case in respect to the place of payment is here pertinent, to wit:

"The defendant resided in the state of New York, and the business, on his behalf, in making the sale of both pieces of land to plaintiff, was done by one J. C. Hall at Boone, Iowa. We inquire for the mutual understanding of the parties when the sale was made. A long time prior to the transaction in question the defendant had sold to plaintiff another tract of land, and the notes had been made payable at the office of the investment company in St. Louis. The money for the interest had been regularly sent to that office and from that office to the defendant, who returned the interest coupons, and, lastly, the note, to the investment company, who sent them to the plaintiff. The investment company was in no sense a necessary agency in the doing of the business, nor even a convenience. Its location was distant from both parties, so that the cause of its agency was a matter exclusively between it and the defendant. The payments there were not in any sense for or at the instance of plaintiff. The provision therefore must have been at the in-

stance of defendant, and to subserve his purposes. The second transaction, out of which originated the note in question, was made in the light of the other, and it is not too much to say, as a matter of fact, that both parties must have understood, when the same terms were fixed as to the place of payment, that it would be observed as was the other, by the money being paid to the company, to be sent forward, and the securities returned through the same channel. If the parties so understood, it was a special authority for such payments to be made at St. Louis, and the defendant should be bound by them in the absence of notice to plaintiff to discontinue such payments. The conclusion of fact as to the authority seems fully warranted. If we are warranted in saying the provision as to payments being made at St. Louis was for the defendant, and it is a fact that he lived in New York, the question naturally arises, what was it for? If, because of business relations between defendant and the company, then defendant must have understood that the money would be sent there, and that the securities must be there for return to the plaintiff, or the company must take the money as it did, and send it to New York to get the securities for return to the plaintiff. That the company at St. Louis was the agent of defendant admits of no doubt, but that fact would not make a payment to it binding, if it had not the securities, unless there was authority for such a payment; and we reach the conclusion that there was such authority, and that it was an agency purely in the interest of the defendant, in no way a necessity or convenience in the doing of the business between the parties; that plaintiff would naturally understand the money was to be sent there as payment, and that the parties acted in accord with such an understanding in carrying out the transaction. Nothing in the transactions justifies a conclusion that the plaintiff would or should have sent his money to the company at his risk, and it must have been understood, when the place was selected for payment, that the money would be sent there for that purpose."

We think the reasoning of the court in that case was sound, and equally applies to the situation presented in the cause at bar. We hold, therefore, that the court rightly concluded that the loan company had ostensible authority to receive payment of the note in controversy, and therefore it was the agent of the holder of the paper, Henry Richings.

Did this agency terminate at the time of the death of Henry Richings, or did it continue in respect to the payment made by the payer so that the holder's legatee, the plaintiff, was bound thereby? It is to be observed that the evidence in this relation showed that the holder's death occurred on December 12, 1922, approximately six months prior to the maturity of the paper sued on. On January 19, 1923, plaintiff was appointed as executrix of the estate of the holder, who was her father, and by his will the note was bequeathed to her. We may properly infer that at that time the loan papers came into her possession. Those on their face showed that the note and the unpaid interest coupon matured on June 1, 1923, and by their terms were payable at the office of the loan company. As the suit only involved the principal and the last interest item, plaintiff doubtless knew that all interest payments theretofore had been paid to the loan company, and by it had been remitted to the Bennett Company. And it is probable, though this may be speculation, that plaintiff was informed by the Bennett Company that the loan company had negotiated the renewal of the paper at its original maturity in 1918, as it is shown by the record that the execution of the assignment of the loan from the estate to plaintiff was acknowledged before W. W. Bennett as notary public, who was the president of the Bennett Company, the concern with which all prior transactions were had by the loan company. Plaintiff, therefore, had approximately five months prior to the maturity of the renewal loan in which to have notified the payer of the death of the holder, Henry Richings. This she did not do.

There can be no doubt that, as a general rule, the death of the principal terminates the authority of an agent. 2 C. J. 546, paragraph 179. The rule has been stated by this court in Kimmell v. Powers, 19 Okla. 339, 91 Pac. 687, to wit:

"Where the relation of principal and agent exists, the death of either party terminates the agency, except where the agent has a pecuniary interest of his own in the execution of the agency."

To the general rule as thus laid down, there is another exception which, so far as our investigation goes, has not had the consideration of this court, but it has found application elsewhere. This exception has been well stated in Ish v. Crane, 13 Ohio St. 574, where the same was expressed in this language, to wit:

"That the death of the principal is a revocation of an existing agency by operation of law.

"That a bona fide transaction by an agent, not necessarily to be done in the name of

the principal, as a deed, etc., but a matter in pais merely, done after the death of the principal, but in ignorance of the event, and within the scope of the agency, is, nevertheless, valid and binding on the representatives of the principal."

The rule thus laid down was upon a rehearing of that case, the first opinion being reported in 8 Ohio St. 520.

This exception to the general rule received consideration in DeWeese v. Muff, 57 Neb. 17, 77 N. W. 361, 73 A. S. R. 488, 42 L. R. A. 789. Addressing itself thereto, the court used this language:

"Undoubtedly, the rule is that the death of a principal instantly terminates the agency; but it by no means follows that all dealings with the agent thereafter are absolutely void. Where in good faith one deals with an agent within his apparent authority, in ignorance of the death of the principal, the heirs and representatives of the latter may be bound, in case the act to be done is not required to be performed in the name of the principal. There is a sharp conflict in the authorities on the question, but it is believed that the better reasoned cases sustain the proposition stated, among which are the following: Ish v. Crane, 8 Ohio St. 520, 13 Ohio St. 574; Cassiday v. M'Kenzie, 4 Watts & S. 282, 39 Am. Dec. 76; Davis v. Lane, 10 N. H. 156; Dick v. Page, 17 Mo. 234, 57 Am. Dec. 267; Moore v. Hall, 48 Mich. 143; 1 Am. & Eng. Ency. of Law (2nd Ed.) 1224.

"We quote the following apposite language from the opinion in Ish v. Crane, 8 Ohio St. 520: 'Now, upon what principal does the obligation, imposed by the acts of the agent after his authority has terminated, really rest? It seems to me the true answer is, public policy. The great and practical purposes and interest of trade and commerce, and the imperious necessity of confidence in the social and commercial relations of men, require that an agency, when constituted, should continue to be duly accredited. To secure this confidence, and consequent facility and aid to the purposes and interests of commerce, it is admitted that an agency, in cases of actual revocation, is still to be regarded as continuing, in such cases as the present, toward third persons, until actual or implied notice of the revocation. And I admit that I can perceive no reason why the rule should be held differently in cases of revocation by mere operation of law. It seems to me that in all such cases the party who has, by his own conduct, purposely invited confidence and credit to be reposed in another as his agent, and has thereby induced another to deal with him in good faith, as such agent, neither such party nor his representatives ought to be permitted, in law, to gainsay the commission of credit and confidence so given to him by the principal.

And I think the authorities go to that extent: See Pickard v. Sears, 6 Ad. & E. 69. The extensive relations of commerce are often remote as well as intimate. The application of this doctrine must include factors, foreign as well as domestic, commission merchants, consignees and supercargoes, and other agents remote from their principal, and who are required for long periods of time not infrequently, by their principal, to transact business of immense importance, without a possibility of knowing perhaps even the probable continuance of the life of the principal. It must not infrequently happen that valuable cargoes are sold and purchased in foreign countries by the agent, in obedience to his instructions from his principal, after and without knowledge of his death. And so, too, cases are constantly occurring of money being collected and paid by agents, under instructions of the principal, after and without knowledge of his death. In all these cases there is certainly every reason for holding valid and binding the acts so done by the agency which the principal had, in his life, constituted and ordered, that there would be to hold valid the acts of one who had ceased to be his agent, by revocation of his power, but without notice to the one trusting him as agent'."

In that case, it is to be noted that the maker of the note paid the same to an agent who was in possession of the note, indorsed in blank by the payee, but paid after the death of the payee and without notice thereof. As has already been noted, however, possession of the paper is not the only evidence of authority of an agent to receive payment. The fact, therefore, that in that case the agent had possession of the paper does not affect the rule there applied, for, as was there observed, it was not necessary for the agent to receive payment of the note in the name of the principal, and as was held in Dick v. Page, 17 Mo. 234, 57 Am. Dec. 267, one of the cited cases, to wit:

"The rule that the act of an agent, after the death of his principal, is void, only applies to those acts which must be done in the name of the principal, and not to those which the agent may do in his own name."

In Cassidy v. McKenzie, 4 Watts and Sergeant (Pa.) 282, 39 Am. Dec. 76, also cited in the DeWeese Case, the court, speaking to the rule, used this language:

"But, finally, it is contended that a payment, after the death of the principal, is not good. It is conceded that the death of the principal is ipso facto a revocation of a letter of attorney. But does it avoid all acts of the attorney intermediate between the death of the principal and notice of it? In Salte v. Field, 5 T. R. 214, Mr. Justice Buller observes: 'It has been questioned with respect to an agent acting under a

power of attorney, whether acts done by him before he knows of the revocation of his warrant, are good against the principal; and it seems that the principal in such case could not avoid the acts of his agent, done bona fide, if they were to his disadvantage, though he might consent to avoid such as were for his benefit.' And in Hazard v. Treadwell (Stra. 506) 12 Mod. 346, it is ruled, that the credit arising from an ostensible employment continues at least with regard to those who have been accustomed to deal on the faith of that employment until they have notice of its being at an end, or till its termination is notorious. And these are principles founded on the most obvious justice. Thus, if a man is the notorious agent for another to collect debts, it is but reasonable that debtors should be protected in payments to the agent until they are informed that the agency has terminated. But this, it is said, is only true of an agency terminated by express revocation, and does not hold, of an implied revocation by the death of the principal. It would puzzle the most acute man to give any reason why it should be a mispayment when revoked by death and a good payment when expressly revoked by the party in his lifetime."

In Carriger's Adm'r v. Whittington's Adm'r, 26 Mo. 311, we find this language, to wit:

"Although by the common law an agency terminated by the death of the principal, and all subsequent acts of the agent cease to bind his heirs or executors, yet judicial tribunals, especially those having equitable jurisdiction, have, for the convenience of trade and commerce and in accordance with the principles of natural justice, very much modified this doctrine. * * * In Cassidy v. McKenzie, 4 Watts & Serg. 282, the Supreme Court of Pennsylvania declared in good sense and sound reason there was no difference between a revocation of an agency by the act of the principal and a revocation by his death, which was the act of God, and that, in either case, where the parties dealing were acting in good faith and ignorant of the revocation, the principal or his representatives ought to be bound."

By section 170, C. O. S. 1921, it is in part provided:

"The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma."

Section 7789, Id., enumerating several methods, in part, provides:

"A negotiable instrument is discharged; * * * by any other act which will discharge a simple contract for the payment of money."

At common law, the parties to a contract for the payment of money were competent to provide therein for the place of payment. Weyand v. Park Terrace Co., 202 N. Y. 231, 95 N. E. 723, Ann. Cas. 1912D, 1010; 6 R. C. L. 902, par. 287.

It is clear, under the record, that the act of receiving payment of the obligation in controversy by the loan company at the place designated therein was not required to be done in the name of the holder, and was received in its own name as agent under the ostensible authority conferred on it by the holder to the time of his death, of which fact neither the payer nor the loan company, so far as the record shows, had notice at the time of payment. In these circumstances, we are of the opinion that under the rule of the cited relevant cases, the payment thus made was binding on plaintiff and discharged the debt. This modification of the common-law rule of revocation of agency by death, we think, will best subserve the condition and wants of the people of this state, and thus enable them to transact the business of our ever expanding commercial life, now conducted through multiplied agencies, with a proper sense of safety and security.

The judgment of the district court is therefore affirmed.

HALL, REID, FOSTER, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 21 R. C. L. p. 822; 3 R. C. L. Supp. p. 1192; 4 R. C. L. Supp. p. 1431; 6 R. C. L. Supp. p. 1285; 7 R. C. L. Supp. p. 721. (2) anno. 23 L. R. A. (N. S.) 414; L. R. A. 1916 B, 860; 3 R. C. L. p. 1289; R. C. L. Perm. Supp. p. 1023. (6) 21 R. C. L. p. 860; 3 R. C. L. Supp. p. 1198. (7) 21 R. C. L. p. 859. See "Agency," 2 C. J. § 71, p. 463, n. 16; § 181, p. 549, n. 49, 50, § 731, p. 960, n. 7; §733, p. 962, n. 19 "Bills and Notes," 8 C. J. § 828, p. 594, n. 27; §830, p. 596, n. 52; §835, p. 599, n. 85; §1322, p. 1016, n. 33.