574 SUPREME COURT OF OHIO.

Reeves et al. *v.* Skenett, jr., et al.—Ish *v.* Crane et al.

OWEN T. REEVES ET AL. *v.* WILLIAM H. SKENETT, JR., ET AL.

MOTION to dismiss appeal. Reserved in the district court of Ross county.

———————

JACOB ISH *v.* JOHN CRANE ET AL.

A., owning a tract of wild land in a remote part of the state, by letter requested B., living near the land, to sell the same for him, at a price named in the letter. B., in accordance with the request, shortly after the death of A., but without notice of the event to either party, sold the land to C. at the price named, part paid in hand and the balance to be paid on receipt of a deed from A., and gave C. possession of the land. C. afterward paid the balance of the purchase money to the guardian of the heirs of A., on demand thereof. C. continued in possession and made permanent improvements upon the land. Afterward the heirs of A. brought an action to recover the land, and C. thereupon commenced this suit against said heirs to enjoin their proceeding in such action. Held :

1. Where a case has been submitted upon an agreed statement of facts, reduced to writing and signed by the counsel of the respective parties, such statement can not be withdrawn or the agreement retracted by either party, except by leave of court on cause shown.

2. That the death of the principal is a revocation of an existing agency by operation of law.

3. That a *bona fide* transaction by an agent, not necessarily to be done in the name of the principal, as a deed, etc., but a matter *in pais* merely, done after the death of the principal, but in ignorance of the event, and within the scope of the agency, is, nevertheless, valid and binding on the representatives of the principal.

APPEAL. Reserved in the district court of Wood county.

The case is stated in the opinion of the court.

*J. H. Reid*, for plaintiff.

*James Murray*, for defendants.

SUTLIFF, C.J.—The petition filed in the court of common pleas of Wood county, by Jacob Ish, states that on the 16th day of August, 1844, Samuel Crane, then living in Fayette county, Ohio, was the owner of the northwest quarter of section 17, in township 7, north of range 12 east, of land situate in Wood county, Ohio; and that being desirous of selling said land he wrote to James La Ferry, of Perrysburg, in said Wood county, the following letter:

"PLEASANT TOWNSHIP, FAIRFIELD COUNTY,
"August 16, 1844.

" *My Dear Cousin James:*—I never received your kind favors until this month, not being in town often, and not expecting a letter, consequently it lay in the office till advertised. You tell me that there is a chance of selling my land if I would take some trade, or that I could have a part improved for the other part. Considering my present afflicted state of body, I would rather sell the land than otherwise. You inform me that land is low in that county, and that land has been sold in an adjoining section at $3 per acre. I would not like to take less than $500 for the quarter; that would be a little more than $3 per acre. Rather than take less I would sooner give a part of the land to have the other part improved; say sixty acres, reserving one hundred for myself. I would be very glad, James, if you would sell my land. I

am anxious to ,sell.   Do try to sell, if you can, and I will
satisfy you for it.   I want you to do the best you can for me,
for I am poor and needy.   I want, if you can sell, to write
and tell me on what conditions you can sell it, and what kind
of pay or payment you can get, and also what amount of
improvement might be done for sixty acres of land.   Do write
soon and let me know.

      " (Signed,)                              SAMUEL CRANE."

    The petition further states, that, in the early part of the
year 1845, La Ferry, as agent of said Samuel Crane, entered
into a written contract with the plaintiff to sell him half of
said quarter section at the agreed price of $250, both parties
being then ignorant of the death of Samuel Crane, but which
had, in fact, occurred on the 28th day of December, 1844,
leaving the defendants, then minor children, his heirs.   That
by the terms of said contract the plaintiff was to have pos-
session of said lands so sold to him, which were wild and
unimproved, and to pay the said purchase money—$50 in
hand and $200 as soon as a good deed of the land in fee
simple should be executed and delivered to him—and that said
La Ferry, at the same time, received the $50 and gave the
plaintiff possession of the lands.

    The petition further states, that on the 9th day of August,
1845, James Trimble, who was the guardian of the heirs of
Samuel Crane, tendered to the plaintiff a deed of the land
executed by himself, as such guardian, purporting to convey
the land in fee simple to the plaintiff, and demanded the
purchase money.   That having some doubts as to the deed
conveying a perfect title, the guardian and the plaintiff called
upon a lawyer at Perrysburg for legal advice, and were ad-
vised that the deed of the guardian was sufficient to vest a
good title in the plaintiff; and from such advice, supposing
the deed to convey a perfect title to him in said land, and
that the guardian was entitled to demand and receive the
remainder of the purchase money, the plaintiff paid to him
the said sum of $200 called for by the contract, and accepted
the deed, which was, in fact, insufficient to convey the title.

Ish *v.* Crane et al.

That the plaintiff continued in undisputed possession of the land, ignorant of the defects of the deed, until in April, 1855, and had then made improvements thereon of the value of $700 or upward, and had paid taxes to the amount of $83, when he received notice from Peter C. Benadum, the guardian of said heirs, to quit possession of said land.

The petition further states, that the money so paid by the plaintiff was all, or nearly all, expended by their guardian for the clothing, education and support of said minor heirs; and that they had not sufficient other means for their support; and that if they had not had the benefit of the money so paid by the plaintiff said land would necessarily have been sold for their support.

The petition further states, that the defendants, as heirs of said intestate, shortly after said notice by their guardian, commenced suit in the court of common pleas of said Wood county to recover possession of said land, and $50 damages for their detention.

The plaintiff prays an injunction against the defendants' further proceeding to recover possession, and that they be respectively required by the decree of the court, as they arrive at the age of majority, to execute to the plaintiff suitable deeds of conveyance of said land in fee simple.

To this petition the defendants demurred, and the court of common pleas sustained the demurrer, and gave judgment for the defendants.

To reverse that judgment the plaintiff filed his petition in error in the district court, and the case was therein reserved to this court for decision, and was heard in this court and judgment rendered at its December term, 1858, reversing the judgment of the court of common pleas (see 8 Ohio St. Rep. 520), and the case was remanded to the court of common pleas for further proceedings.

The minor defendants thereupon, by their guardian *ad litem*, answered that "they deny each and every allegation of plaintiff's petition." The answer is subscribed by their guardian, but not sworn to.

Emily Crane, one of the heirs, answers, denying that La

Ferry was authorized to contract for the sale of the land, and denies that the heirs of Samuel Crane received the benefit of the purchase money paid by the plaintiff for the land.

It is also stated, in a supplemental answer, that the defendants have paid a large amount of taxes on the land, to-wit: one hundred dollars ; and ask, in case a decree be rendered for the plaintiff, that an account be taken, etc.

Upon hearing in the court of common pleas, a judgment was rendered for the plaintiff, and the defendants appealed the case to the district court, and on hearing in that court the case was again reserved to this court for final decision.

The case was heard in the court of common pleas upon the following agreed statement of facts, signed by the counsel of both parties, and filed with the papers in the case, and now with the pleadings :

" It is admitted in this case, for the purposes of the trial, that all the allegations of fact in the petition stated, are true, except the authority of La Ferry to make the sale of the 'ands in the petition described, and, as to that fact, the genuineness of the letter attached to the petition is admitted; its sufficiency as authority to make such sale being submitted to the court as a matter of law.    February 27, 1860."

The certificate of reservation, sent up with the papers from the district court, shows that when the case came on for hearing in that court, on the 7th day of June, 1860, on the foregoing agreed statement of facts, it was on that day reserved for hearing in this court, and certified to this court, June 27, 1860.

There is now found, with the papers filed in and belonging to this case, a paper neither filed in the case nor proved, of the following tenor :

JACOB ISH, Plaintiff       ⎫
       v.                  ⎬
JOHN CRANE ET AL, Defendants. ⎭

PERRYSBURGH, August 27, 1860.

The plaintiff, Jacob Ish, and his attorney, John H. Reid, Esq., will take notice that I am instructed by the defendants,

and in accordance therewith, do now revoke, withdraw and annul the stipulation or admission, in writing, made by me, as such attorney, without consultation with my clients, for the purposes of the trial, on the 27th of February, A. D 1860, and that we will not permit the same to be used on the further trial of this cause; but do consent that plaintiff may take depositions to prove the disputed issues of fact, on giving the usual notice therefor, at any time prior to the 1st day of December, A. D. 1860, the defendant to have like leave to take depositions to rebut or meet the testimony taken by plaintiff, for twenty days after the close of plaintiff's testimony; the defendants do not withdraw the admission of the genuineness of the letter attached to plaintiff's petition.

(Signed) "JAMES MURRAY, Att'y of Defendants."

This paper is indorsed as follows: "Received this notice August 27, 1860, at 7 o'clock, A. M., and served the same by delivering a true copy to John H. Reid, attorney for Jacob Ish, August 27, 1860, 8 o'clock, A. M. C. W. Norton, sheriff; by J. B. Spafford, deputy."

It is insisted by counsel of defendants that, by virtue of this paper, dated August 27, 1860, now in this court, placed among the papers, the agreed statement of facts upon which the case was submitted in the district court, and reserved to this court, is annulled; and that the case is to be regarded by this court as if the agreed statement of facts were withdrawn from the files, and that the case is to be decided barely upon the pleadings.

The counsel of plaintiff, on the other hand, has argued the case, and seems to rely fully upon the agreed statement of facts.

How then is this agreed statement of facts to be regarded; as revoked, or still in operation upon the parties?

It has long been the practice in this state, as well as in the courts of other states, for counsel to mutually agree upon a state of facts, and to reduce the agreement to writing, and file it in the case, instead of being to the trouble and expense of taking proof by depositions, or otherwise, to show the

facts. And when such agreement is reduced to writing and signed by the parties, or their counsel, and filed in the case, I think the general understanding, both of the bar and court, has been that the same was to be regarded, until set aside by the court, as a special verdict of a jury, expressing the result of the proof made by both parties, and so belonging to both parties, that neither party could withdraw the same.

It is not doubted that, in case of an agreed statement having been so made and filed by mistake, or misapprehension of the existing state of facts by one of the parties, he might, consistently with fair practice, upon notice to the adverse party or his counsel, apply to the court for leave, on the ground of such mistake or misapprehension, to withdraw from the files such agreed statement, or such part thereof as was, in fact, untrue, and had been so assented to by mistake or misapprehension. And upon the merits of such motion being sustained by proof, satisfactory to the court, it is not doubted the court might grant such relief as the party should show himself justly entitled to.

But no application has been made to the court in this case for leave either to withdraw or amend the agreed statement of facts. It has not been proved, or even stated, that the statement so filed and made part of the record, is not a true and fair exposition of the facts of the case. Nor is there any evidence before us that either Jacob Ish or his counsel had ever been served with notice that opposite counsel proposed to recede from his agreed statement. The word "sheriff," affixed to the name "C. W. Norton," and "deputy" to the name of Spafford, obviously add nothing to the character of the paper. Indeed, neither the names Norton or Spafford, appear on the record as officers of the lower courts, and they are strangers in this court. The writing which purports to be a return is, therefore, in no sense to be regarded as an official return of an officer of court. The agreed statement of facts must then be regarded obligatory and in full force upon the parties.

The case, therefore, by this agreed statement of facts, upon which it was submitted and reserved, presents for our consideration the same questions as when before us, and decided

upon demurrer at the December term, 1858. 8 Ohio St. Rep. 520.

When the case was before us upon demurrer, it was not insisted upon, by counsel for the defendants, that the letter did not, upon its face, authorize La Ferry to sell and give possession of the land, in the manner he did; but counsel relied entirely upon the death of Samuel Crane, as a revocation of the authority conferred by the letter.

But the counsel of defendants now insist upon both points:

1. That the letter of Samuel Crane conferred, by its terms, no authority upon La Ferry to make the contract of sale and give possession of said lands to Jacob Ish, as stated in the petition.

2. That the death of Samuel Crane, prior to the making of the contract and giving possession by La Ferry, revoked all authority conferred by the letter, and rendered utterly void the acts of La Ferry, so done by him as agent of Crane.

In addition to the views expressed heretofore when this case was before us (8 Ohio St. Rep. 524), I propose to consider both the foregoing propositions, now argued and submitted for our consideration by counsel.

Let us, then, in the first place, recur to the letter, and consider whether, by its terms, La Ferry was authorized to sell the land for cash, and give possession of the same.

The material parts of the letter, on this point, are the following:

" My Dear Cousin James. * * * You tell me there is a chance of selling my land, if I would take some trade, or that I could have a part improved, for the other part. Considering my present afflicted state of body, I would rather sell the land than otherwise. You inform me that land is low in that county, and that land has been sold in an adjoining section at $3 per acre. I would not like to take less than $500 for the quarter; that would be a little more than $3 per acre; rather than take less, I would sooner give part of the land to have the other part improved, say sixty acres, reserving one hundred for myself. I would be very glad, James, if you would sell my land. I am anxious to sell; do

try to sell, if you can, and I will satisfy you for it. I want you to do the best you can for me, for I am poor and needy. I want, if you can sell, to write and tell me on what condition you can sell it, and what kind of pay or payment you can get, and also what amount of improvement might be done for sixty acres of land. Do write soon, and let me know."

The fact of an agency, it is said, may be proved, not only by proving an express authority given to the alleged agent, but also by showing circumstances from which the authority must necessarily, or may reasonably, be inferred. And an agency, so constituted, may be either special, general, or universal. It may be to make a particular contract, to buy or sell certain specified property upon specified terms; or to buy or sell certain property generally, and the same as to the performance of any business; or, the agency may be a universal agency—to do, generally, any, and all business.

In this case, if the agent is to be regarded as controled by the valuation of the property, expressed by the principal, the agency was special; if effect is to be given to the expression—" I am anxious to sell, do try to sell if you can, I will satisfy you for it; I want you to do the best you can for me;" the agency would have to be regarded as a general one.

It is, however, quite immaterial whether the agency be here regarded general or special, inasmuch as Crane, in the letter, proposed to take " a little more than $3 per acre," and such price as to bring him $500, for the quarter section. And at that price—such price as would bring five hundred dollars for the one hundred and sixty acres—it was, that the writer of the letter urged an immediate sale in the language— " I am anxious to sell; do try to sell, if you can. I will satisfy you for it. I want you to do the best you can for me, I am poor and needy;" and, under these instructions, the sale of one half the land was in fact made for cash, and at the full price per acre, fixed by the owner.

There is much in the letter expressive of the wishes of the writer for the earliest possible sale of the land, and of

Ish *v.* Crane et al.

his reliance upon his cousin to make such sale, if practicable. The willingness expressed, if it could not be sold for money, to exchange or sell part of it for improvements to be made on the remaining part, seems to have been in his mind only a possible necessity, in case no sale for cash could be effected, without first making improvements. The sense of the instruction given, as expressed by the letter is—I authorize and request you to sell my land as soon as practicable at five hundred dollars, which is a trifle over three dollars per acre. Sell as soon as possible, for I am in need. The last paragraph of the letter, evidently contemplates a possible inability, on the part of La Ferry, to make any cash sale as requested, and a necessity to sell part of it, and take the payment in work and labor on the remainder of the lands; or to sell for some other property, or on other conditions; and in such a case, Samuel Crane, after having made known his urgent desire for an immediate cash sale, concludes his letter by saying, he wanted La Ferry to write him on what conditions, and for what pay, or for what amount of improvements the land could be sold. But this request for information from La Ferry, was only in case of a necessity to sell for different pay or different price than that for which the agent was already instructed and urged to make prompt sale; and so the writer adds to his request, that La Ferry should, in such a case write—" what kind of pay or payment " he could get, and " what amount of improvement might be done for sixty acres of land "— all which Crane evidently solicited and expected only in case the land could not be sold for cash, at the price per acre that he had directed in the preceding part of the letter.

There is nothing, indeed, in the closing paragraph relating to a sale for other pay than money, or some possible shift in case the land could not be sold for money, as desired, to at all qualify the plenary instruction given to sell, if practicable, for cash; and in selling, to do the best he could for the principal in view of present infirmity, poverty, and necessity—all mentioned, apparently, to stimulate the agent to prompt action in making the sale.

" Agency," says Chancellor Kent, " is founded upon a contract either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name, or on his account, by which that other assumes to do the business, and to render an account for it" 2 Kent's Com. 784. The authority of the agent to contract for the principal, rests upon the consent of the principal; and such consent may be shown to have been given by the principal either before or after the transaction by the agent And this ground of liability of a principal for the acts of an agent, is very briefly and correctly indicated by the maxim of the Roman law—" *Qui mandat ipse fecisse videtur.*"

But in this case Crane did not barely say in his letter to his cousin, I consent for you to sell my land for me as well as you can; I value it at $500, etc.; but the writer adds to his request that his friend should make sale of the lands, as we have seen, the most pressing considerations for the most prompt execution of the agency.

Under such plenary authority and pressing request from Crane to act as his agent in making sale of the lands, La Ferry shortly after receiving the letter, found an opportunity to sell half the land for all money, $50, in hand, to relieve the old man's present need, and $200, to be paid on receipt of the deed; and sold and gave possession to Ish, and forwarded the $50 to Crane, whose representatives received it. And, no one, I think, can read the letter of the old man— containing, as it does, the simple graphic representation of his infirmities and needy condition, and his pressing importunities to La Ferry, to make sale of his lands, and doubt that had Samuel Crane been living, he would not only have expressed his assent, but also his thanks, for the sale and remittance so made by La Ferry, in answer to his letter. Indeed, when this case was before this court upon demurrer, raising all the questions of law now presented, as before remarked, it was not understood that counsel of defendants seriously questioned the sufficiency of the letter to authorize such a sale by La Ferry as agent, had the principal been living at the time of making the sale. But as the question is

now made of the sufficiency of the letter, we have thought proper to consider more fully the authority conferred by the terms of the letter; and I think it can not be successfully disputed that the letter does, by its terms, clearly authorize such a sale and giving possession of the land, as was made by La Ferry to the purchaser; so that the sale would have been as obligatory upon the principal had he lived, as if made by himself.

This leads us to the main question in the case—did the unknown death of Crane previous to the execution of the agency by La Ferry, render void the acts done under the apparent authority conferred by the letter?

A large number of cases are cited by counsel of defendant to show that the weight of authority is against the former holding of this court. It would be a tedious task to remark at length upon each of the cases referred to. Both the English and American cases were referred to and commented upon at considerable length when this case was formerly before the court, and our remarks upon the authorities then introduced, and for the most part the same as he again cited, will be found in the report of that decision, 8 Ohio St. Rep. 520.

The general rule that the acts of the agent depend for their validity upon the authority with which he is invested by the principal at the time he assumes to act for him, was then, as it is now, fully recognized. But that decision proceeded upon the ground that where an agent had been constituted and invested with authority to act for the principal, and third persons thus invited by the principal to accredit him as such agent, transactions on the part of such persons with the agent, in good faith, within the scope of his agency, and in ignorance, or without either express or implied notice of the revocation of the authority, are generally binding. If the revocation, without such notice be express, and made by the principal in his lifetime, such acts of the agent are binding on the principal; but if the revocation is one merely resulting by operation of law, as by the bankruptcy, lunacy, coverture or death of the principal, then such acts, so done in good

faith and in ignorance of such event (except such acts as must necessarily be done in the name of the principal), are binding on his representatives. A majority of the court in that case held that under such circumstances, and to such extent, the transactions of the agent within the scope of his agency, were as binding upon the representatives of the principal as would have been the same acts, if done before such revocation of the agency by the death of the principal, had in fact occurred.

In that opinion it was conceded that it had been held by highly respectable authority that while this rule prevailed in Scotland, and generally throughout the continent of Europe, it never, in fact, obtained as a rule of the common law; but it was, at the same time, in the opinion insisted that there was equally high and respectable authority for affirming that the rule really existed at common law, as well as under the civil law. And to justify the application of the rule in that case it was only necessary then to show that it was doubtful whether the rule did not, in fact, obtain at common law. And unless it can be shown beyond a reasonable doubt that this just and equitable rule was not recognized at common law, it will not be pretended that this court ought to recede from its former holding in that regard.

The importance of the question and the high respect entertained for the opinions of my brethren, who are unable to concur in the opinion of the majority of the court, together with some additional authorities introduced by counsel, seem to invite a somewhat careful review of our former opinion upon this question.

Among the authorities favoring the proposition as the common law doctrine recognized in England, I referred to the following: Coke on Lit. sec. 66; *Wynne* v. *Wynne*, 7 Mod. Rep. 503, and reported also in Wil. 563; 6 East Rep. 356; *The King* v. *Corporation of Bedford Level*, cited by Chancellor Kent, or referred to in his Commentaries, vol. 2, p. 646, as authority for denying that the doctrine prevails in English law. Also, *Shipman* v. *Thompson*, Wil. Rep. 103, note, referred to by Chancellor Kent. I also cited Russell

on Fact. and Brok., p. 317, as follows: "Again, the death of the principal will operate as a revocation of the authority," etc. "But where the factor or broker has authority to do an act in his own name, then it would seem that the death of the principal will not *ipso facto* determine such authority." Also, to the same effect, Chitty on Com. and Manuf. 233. I also cited from Chitty on Contracts, 19, the following: "And it is said that a sale or purchase by an agent, even after the death of his principal, if made without notice of the fact, will bind the representatives of the latter." I had supposed at the time it was an English text, but I have since heard that it is an American edition, and the same language is not found in the English edition of that work.

The very numerous authorities cited by the defendants, with the particular exceptions to which I shall presently refer, only go to assert or recognize the general rule, which no one can dispute, that the death of the principal is, by operation of law, a revocation of any existing agency, constituted by him in his lifetime, and which would, but for such revocation, have still existed. Thus, we are referred to the case of *Wallace* v. *Sanders*, 7 Ohio Rep. 178, in which it was held by the court that an entry of land, purporting to have been "made by Anthony Singleton, attorney in fact for Christian Holmer, *deceased*," and made in his name, could be of no effect. The court, in giving the opinion, says: "It can not be doubted that, as a general rule, the authority of the attorney ceases upon the death of the principal." But in that case the attorney describes his principal as "*deceased*"—very far from showing the *fact* of his death being *unknown* at the time. Besides, the entry was an act that had to be made in the *name* of the principal, and so *necessarily* void. And this was the very point decided in the case of *Galt* v. *Galloway*, 4 Peters, 344, cited by defendants' counsel, that "an entry made in the *name* of a dead man is void."

We are, however, referred to the American Leading Cases, vol. 1, page 587, which seems directly in point. It is there laid down by the learned authors of that work, not only that "the death of the principal * * * is an immediate

·determination of an authority not coupled with an interest;" but they also add : " and acts done by the agent after the principal's death, though in ignorance of it, and in good faith, are void." I propose here to refer to all the cases cited by the compilers in support of their foregoing proposition, as I ·did in regard to the cases referred to by Chancellor Kent in ·our former consideration of this case, so that we may see whether or not the proposition is sustained by the authorities ·referred to.

The first case there referred to in support of the proposition is *Hunt* v. *Adm'r of Rousmaniere*, 2 Mason Rep. 242. ·The petition in that case stated in substance that Rousma-·niere had, in his lifetime, undertaken to secure his indebtedness to Hunt, the complainant, upon the schooner Industry, either by mortgage or bill of sale, or by a power of attorney, authorizing Hunt to sell the schooner and from the proceeds pay the indebtedness, in case the debtor should fail to pay the same ; that, by the advice of counsel, the letter of attor-ney was executed as the most eligible and sufficient security ·upon the schooner ; that, after the execution of the power of attorney, Rousmaniere died without paying the debt, and ·praying that the power of attorney might be regarded as a mortgage, or held to continue in full force, etc., to sell the schooner. On demurrer, the court refused to relieve the party, holding the authority to sell revoked by the death of the intestate, the principal. This case does not, therefore, look toward sustaining the proposition.

The next case referred to is that of *Companari* v. *Wood-·burn, Adm'x of Woodburn*, 15 C. B. 400. The declaration, in that case, stated that it was agreed between the plaintiff and the said intestate that the plaintiff should endeavor to ·sell a certain picture of said intestate, and that if the plain-tiff succeeded in selling the same, the said intestate would pay him £100 ; that, in pursuance of said agreement, he ·did, before and after the death of the said intestate, en-·deavor to sell, and after the death of said intestate, he did, in consequence of such endeavors, succeed in selling the ·said picture, which sale was confirmed by the defendant as

administratrix; and yet the said defendant had made default. in paying the £100, which still remained due from said administratrix to the plaintiff, etc. On demurrer, the court held that the count disclosed no cause of action, inasmuch as the authority from the intestate to the plaintiff to sell the picture was revoked by the death of the intestate, and the defendant's confirmation of the sale, in the absence of an allegation that she was aware of the existence of the contract between the intestate and the plaintiff, was no adoption. of the contract by her, so as to make her liable to pay the £100. This case does not, therefore, have any bearing upon. the proposition to sustain which it is cited.

The next case referred to is *Galt and others* v. *Galloway and others*, 4 Peters' R. 331. The facts in the case, as set forth in the petition, may be briefly stated thus: In August, 1787, James Galt made an entry for military lands, 1000 acres, on part of a military warrant, No. 194, and afterward died intestate, prior to 2d of March, 1807, and subsequently to his death, Elias Langham, without any authority from James Galt, or from the complainants (his heirs), caused an entry of the withdrawal of 400 acres to be made in the books of the surveyor, etc., and a patent for the 400 acres was afterward obtained by Galloway. Langham answered that at the request of one Westfall he withdrew the 400 acres, and that he believed Westfall purchased the warrant No. 194 from Galt in his lifetime, and that he considered himself in possession as the agent of Westfall, etc. Galloway states, in his answer, that Langham withdrew the 400 acres, and that he believes the withdrawal was authorized, but knows not by whom. None of the defendants asserted that they derived any title or acquired a right to the land from any agent of Galt, or that they were in fact ignorant of the death of Galt at the time. The following are the only facts which the court say they find upon proof: "It is in proof that James Galt, to whom the warrant issued, and in whose name the locations under it were made, died in 1800. The withdrawal was made in 1805." And the court proceed to say "No principle is better settled than that the powers of an

agent cease with the death of his principal." And Judge McLean adds what, it is true, is in point in *this* case, although it is difficult to perceive how it was in *that:* "If an act of agency be done subsequent to the decease of the principal, though his death be unknown to the agent, the act is void." Neither the facts of the case, nor the argument of the coun-sel, nor the opinion pronounced, show that this. question arose. The remark of Judge McLean is to be regarded merely as an *obiter dictum,* and is entitled to respect only as such. This, I think, appears even from the point upon which Judge McLean himself puts the case : " On the death of James Galt," the court proceed to say, " the land in contro-versy descended to his heirs, and there is no proof that they authorized Westfall to act on their behalf," etc.

The case of *Jenkins* v. *Atkins*, 1 Humph. R. 294, was an action brought by the agent, who had, on behalf of his prin-cipal, after his death, and in ignorance of the fact, by virtue of a power of attorney from the principal, contracted to sell lands, and, as such attorney, had executed a bond for a conveyance of the same, and received part of the purchase money. The object of the action was to require a specific performance on the part of the vendee with him, the agent, as principal. The case was, by the plaintiff's counsel, placed on the ground of want of authority on his part to execute the bond in the name of the principal, and that it was there-upon obligatory upon the agent as his personal obligation. The plaintiff answered that he was then ready and prepared to make a conveyance of a valid title to the land to the ven-dee, according to the intent and meaning of the parties at the time of executing the bond ; and plaintiff thereupon prayed for a decree for a specific performance on the part of the vendee, and that he accept such conveyance and pay to the plaintiff the residue of the purchase money. The facts in that case, if the suit for specific performance had been brought by the defendant, would have presented the question arising in this case. But the question was neither argued nor presented in that case to the court. It is true that both counsel and court seem to have placed the case upon the

same ground, as if the death of the principal had been well known at the time the contract was made by the agent.

At the next term of the same court (December term, 1840), was decided the case of *Rigs, Aertson & Son* v. *Cage's adm'r*, 2 Humph. Rep. 350. The facts in the case may be briefly stated as follows : Wm. Cage and Marcus Cage, merchants and partners in trade, at Lagrange, Tenn., constituted Bledsoe their agent to purchase goods in Philadelphia. Before the purchase, but unknown to the parties, Wm. Cage died. The goods were sent forward and the surviving partner received them, and executed to the vendors, the plaintiffs, a note in the name of the firm, signed Wm. Cage & Co. James D. Cage, the administrator of Wm. Cage, was sued on that note, also (in one count of the declaration) for goods sold and delivered. No argument of counsel is given, but the question seems to have been fairly presented by the facts of the case. Green, J., the same judge who pronounced the opinion in *Jenkins* v. *Atkins*, in delivering the opinion said : " The only question in. this case is, do the acts of an agent, performed after the death of the principal, in pursuance of authority previously given, and in ignorance of the death of the principal, bind the representative of the latter ? " And upon this proposition he proceeds to say : " The general principle of the common law is, that an authority conferred by letter of attorney, must be executed during the life of the principal. 1 Bac. Ab. Tit. Authority, 2. The death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest. 2 Kent's Com. 645."

The foregoing is the only reasoning, and the only authority given in the case, either by the counsel or court. And having heretofore examined all the authorities referred to, upon which Chancellor Kent, in his Commentaries, rests the question (8 Ohio St. Rep. 529), and shown, as I think, that the authorities so referred to, by no means sustain his proposition ; I only here notice the other authority, Bac. Ab., to which Judge Green refers. It is as follows : " The authority given by letters of attorney, must be executed during the

life of the person that gives it, * * * * because the letter of attorney is to constitute the attorney my representative for such a purpose, and, therefore, can continue in force only during the life of me, that am to be represented. * * * * And hence it is, that if J. S. made a letter of attorney to deliver seizin after my death, it is void, because he can not deliver seizin during my life, for that were plainly without any authority from me; nor can he do it after my death for the former reason." For which the author refers to 60 Lit. 52—where the reason, given by Coke, is as follows : " For if the feoffor dieth, the land descends to his heirs," etc.

The next authority cited in the American Leading Cases is that of *Steirnemaun* v. *Cowing,* 7 Johns. Ch. Rep. 275. There is nothing decided in that case, nor in the facts of the case, having any bearing upon the question, except a remark of Chancellor Kent, expressing the same opinion expressed in his Commentaries, vol. 2, p. 646, that " the principle of the civil law, and which has been adopted by writers following that system, that for the sake of public convenience, powers do not expire until notice of the death of the principal, does not seem to have been hitherto ingrafted into the English law." " But " (adds the learned chancellor), " it is not necessary to form or declare any decided opinion on the subject."

The case of *Houghtaling* v. *Marvin,* 7 Barb. Rep. 412, next referred to, was not a case where the death of the principal was *unknown.* The question in that case, was simply whether the power of the agent was one *coupled with an interest,* and, therefore, exercisable by the agent after the death of the principal. In pronouncing their opinion, the court say (p. 414–15) : " But the amount paid to Tyler, after the death of Hayden, was paid by the defendant without authority, and in his own wrong. He was the son-in-law of Hayden, and *knew of his death.* He says that he assisted in the settlement of his estate. He can not, therefore, have *paid it in ignorance of his death,* and to be protected within the principle of 2 Vesey, 111, and *Smout* v. *Ilberry* (10 Mees. & Wels. 1)." The case, therefore, so far from sustaining the doctrine for which cited, pretty clearly intimates a contrary rule.

The next case cited, that of *Gale* v. *Tappan* (12 N. H. 146), is equally foreign to the question. That was an action upon a promissory note. The demand of payment was made upon the maker by Eaton, as agent of Hannah Tappen, the payee, on the 1st day of November, 1839. It was proved by the defendant that Hannah Tappan died in 1838, and he insisted that no legal demand was, therefore, shown to have been made. It was not pretended by the plaintiff that the death of Hannah Tappan was not well known at the time the demand was made by Eaton, by virtue of the power of attorney, which he had received from her in her lifetime. And the court, therefore, held the objection to the demand well taken, and say : " It has often been settled that an authority of this kind is determined by the death of the principal ;" referring to Coke on Litt. 52b and Bac. Ab. for the general rule. It is evident, therefore, that the case cited is irrelevant.

The only remaining case, to which reference is made by the authors of the American Leading Cases, is that of the surviving partners of *McNaughton & Co.* v. *Moore* (1 Haywood, 217). The case was decided in the superior court of North Carolina in 1795. An action of debt was brought upon a bond, payable to the partnership. The defense was, payment to a clerk of the firm, after the death of McNaughton, one of the partners ; and the case depended upon the fact of the authority of the clerk, by virtue of his having been the clerk and agent of the firm in McNaughton's lifetime, to receive payments on debts due the firm, after its dissolution by the death of McNaughton. From the opinion of the court, it will be seen that this case is also irrelevant. It was not an exercise of the agency, after the death of the principal, *in ignorance* of the suit. Judge Haywood, in his opinion, says : " It is argued to be a hardship upon the defendant, if this payment was not allowed to be good. But there is none—the bond is in the name of *McNaughton & Co.* The *death of the partner* here was *notorious*. It is a thing in itself capable of notoriety, and if a man will pay to the clerk, after the death of the merchant, he acts in his own wrong. * * * * This must be clear, that whatever authority

39

was derived from the deceased, so far as concerned his interest, was countermanded by his death," etc.

I have been thus particular to notice sundry cases referred to by the learned authors of the American Leading Cases, in support of their proposition, that "acts done by the agent after the principal's death, though in ignorance of it, and in good faith, are void." And we have seen that the question involved in the proposition, only arose in *one* of the cases (*Rigs, Aertson & Son* v. *Cage's adm'r*, 2 Humph. 350) ; and in that case, the report shows no argument of the case, or presentation of the question by counsel, as an exception to the general rule that, after an agency is revoked by the death of the principal, the acts of the agent are void. And the court decided the case upon the general principle that the death of the principal is a revocation of the authority of the agent.

Nor are they less successful in maintaining their proposition in their disposition of the two or three cases which they refer to as opposed to their proposition.

The case of *Cassiday* v. *McKenzie*, 4 Watts & Serg. 282, and the case of *Dick* v. *Page & Bacon*, 17 Misso. 234, are certainly both direct adjudications against the proposition that acts of an agent, in good faith, after the death of the principal, and in ignorance of the fact, are necessarily void. In regard to the former they say : "In opposition, however, to all the authorities, it was held in *Cassiday* v. *McKenzie*, that acts done by an agent, after his principal's death, *bona fide*, in ignorance of the fact, are valid and binding ;" and upon the same page they refer to the case of *Dick* v. *Page & Bacon*, as good authority, and, in a foot note, say of it—"undoubtedly a case well decided."

The two cases stands thus : In case of *Cassiday* v. *McKenzie*, the principal, in his lifetime, gave his agent a letter authorizing him to receive and receipt for certain money belonging to the principal. The agent presented the letter of authority to the party to whom it was addressed, and received the money, and gave his receipt for the same, shortly after the death of the principal, and in ignorance of the event.

The court held the payment, so made in good faith and in ignorance of the death of the principal, binding upon his representatives.

The facts in the case of *Dick* v. *Page & Bacon*, were as follows: The principal, Doughty, at St. Louis, being in bad health and about to leave for New Orleans, requested the defendants, who were bankers in St. Louis, to make advancements to his agent, if he should call upon them for money, and told his agent, who was present, to secure them for the same, whether he, the principal, lived or died. The principal went to New Orleans, and died there, on the 11th of March, 1851; and on the 19th of March, 1851, the agent, wanting funds, purchased of Page & Bacon, on account of the principal, an eastern bill for $2000, and placed in their hands, as collateral security, promissory notes to an amount exceeding $2600, the death of the principal not then being known; and the action was brought by Dick, as executor of the principal to recover the money so collected and received by Page & Bacon, on said promissory notes of the principal, so delivered to them by the agent, after the death of the principal. The court say, in deciding the case: "There are respectable authorities, which maintain that the common and civil law harmonize on this subject. So the law is understood to be in Pennyslvania"—referring, doubtless, to the case of *Cassiday* v. *McKenzie*—and the court held the acts of the agent, so done in good faith in ignorance of the death of the principal, valid, and binding upon his representative.

The difference in the two cases is simply this: In the Pennsylvania case, which is said by the authors of that work to be opposed to all the authorities, the agent had a *written* authority to receive the money of his principal, and to receipt for the same in his own name; and by virtue of that authority, and in ignorance of the death of the principal, he did receive it, and the payment so made to the agent was held a good payment.

In the Missouri case, which is said to be "a case undoubtedly well decided," the agent, under *verbal* authority of the principal, after his death, negotiated the purchase of a bill

of exchange for $2000, and contracted to deliver, and did deliver, twenty-six hundred dollars and upward of promissory notes belonging to the principal, as collateral security to the bankers, in ignorance of the death of the principal—certainly a much larger and more complicated transaction than the Pennsylvania case; and if held, undoubtedly obligatory upon the representatives of the principal, it is certainly difficult to perceive how the transaction in the case of *Cassiday* v. *McKenzie* could be held void.

In thus briefly collating the American authorities, the opinions of Chancellor Kent and Judge Story are certainly entitled, from the character of those eminent jurists, to the highest respect; and, although ranging, as their opinions are found to be, upon different sides of this controverted question, it is proper to here refer to the opinion expressed by each.

Chancellor Kent, in his Com., vol. 2, p. 646, thus expresses himself as to the general rule and the exception: "The authority of an agent determines upon the death of his principal; and a joint authority to two persons terminates by the death of one of them. This is the general doctrine. By the civil law, and by the law of those countries which have adopted the civil law, the acts of any agent, done *bona fide* after the death of the principal, and before the notice of his death, are valid and binding on his representatives. But this equitable principle does not prevail in the English law; and the death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest." And the English authorities referred to in support of this statement are: *The King*, v. *Corporation of Bedford Level*, 6 East. Rep. 356; *Watson* v. *King*, 4 Camp. N. P. Rep. 272; *Shipman* v. *Thompson*, Willes Rep. 103, n.; *Wynne* v. *Thomas*, Ib. 563.

Judge Story, in treating upon the same subject, after mention of the same rule in Scotland and other countries where the civil law prevails, as stated by Chancellor Kent, says: "Reasonable as these doctrines seem, and convenient as they must be admitted to be, for the practical purposes of trade

and commerce, it has been thought that they do not prevail in the common law, as recognized either in England or America" (referring to the opinion of Chancellor Kent, as above stated). " But" (continues Judge Story), " it may be doubted whether our law deserves such a reproach, at least to the full extent in which it is usually imputed to it."   *   *   *
" Where the act, notwithstanding the death of the principal, can and may be done in the name of the agent, there seems to be a sound reason why his death should not be deemed to be a positive revocation under all circumstances, and that a subsequent execution of it may be valid.   But where the act is required to be done in the name of the principal, the same objection would seem to lie to it in the foreign law as does lie in our law."   Story on Agency, sec. 495.   In secs. 147, 148 and 150 of the same work, Judge Story treats particularly of the manner of executing contracts by the agent; and taken in connection with sec. 495, I think, the judge may reasonably be understood to concede that the death of the principal necessarily extinguishes the power of the agent to make a conveyance under seal, or to execute any obligation under seal as the deed of the principal, and obligatory as such upon his representatives.   After stating in sec. 147 the rule usually laid down in cases of written contracts (subject to certain qualifications and exceptions), that in order to bind the principal, and make it his contract, the instrument must purport on its face to be the contract of the principal; or, at least, that the terms of the instrument should clearly show that the principal is intended to be positively bound thereby, and that the agent acts plainly as his agent in executing it; Judge Story adds : " Indeed, the rule has been laid down in broader terms, and it has been said to be an ancient rule of the law, that when any one has authority, as attorney, to do any act, he ought to do it in his name who gives the authority," etc.   But in sec. 148 he adds : " This rule, thus laid down, is regularly true in regard to all solemn instruments under seal, although not, as we shall presently see, as to instruments not under seal.   Therefore, if a person is authorized to make a conveyance under seal of the lands of his principal,

and he makes the conveyance by a deed in his own name, it will be a void conveyance," etc.

In sec. 152 the distinction between contracts under seal or deeds, and contracts not under seal, is thus expressed : "But where an act is to be done *in pais*, or in any other manner than by written instrument and seal, then the act will be construed, if it may be, as most effectually to accomplish the end required by the principal; for when the act may take effect, if construed one way, and will be defeated if construed another, *ut res magis valeat quam pereat*, it will, to accomplish the intention of the parties, be construed so as to give it validity."

I think, therefore, it is quite apparent that Judge Story would exclude from the equitable principle, mentioned by Chancellor Kent as peculiar to the civil law, only that class of contracts mentioned in sec. 148, and would recognize the application of the doctrine to acts to be done *in pais*, and to that class of contracts named in sec. 152. Otherwise there would be no ground of dissent left to him from the opinion expressed by Chancellor Kent. And yet, that Judge Story did dissent from the views expressed by Chancellor Kent, is evident from his remark, after referring to the views expressed by the chancellor, in the strong language, that " it may be doubted whether our law deserves such reproach." Nor would he have thus stated the limitation—" where the act to be done *must be done* in the *name* of the *principal*, and *not* in that of the *agent*"—if he had understood any such limitation to be recognized by Chancellor Kent in his statement of the law.

I do not propose to here take further notice of the American authorities, although there is quite a number which might be deemed of more or less importance in determining precisely how the weight of authority in this country stands And I will barely add that I have been thus particular in considering the cases referred to by the authors of the American Leading Cases (and which might seem due to so highly respectable an authority), more particularly for the reason that the work is the *only* American authority, within my

knowledge, which has attempted to sustain the proposition, by adjudicated cases, that acts of an agent, within the scope of his authority and not necessary to be done in the name of his principal, and done in good faith after the death of the principal, and without notice of the event, are necessarily void.

It is to the English authorities, however, we should naturally turn to ascertain the doctrine of the common law on this subject. But there, it will be found, the same dearth of authority prevails. The English cases cited to sustain the doctrine as expressed in Kent's Commentaries, will be found to relate to the general rule of revocation by death, rather than to the exception. It will be found, however, that there is more in those cases to favor than to exclude the idea that the exception insisted upon to the general rule prevails. The first case cited—*The King* v. *The Corporation of Bedford Level* (6 East. 356) certainly contains nothing opposed to the exception; while from a careful examination of the case there is incidentally a recognition of the doctrine insisted upon. The following are some of the points stated in the syllabus: " 3d. That however such deputy were properly or not constituted in the first instance, yet his authority necessarily expired on the death of his principal. 4th. That however the acts of a legal deputy to a ministerial officer *may be good* after the death of his principal, *before notice thereof* to those who are interested in his acts, as being done under the color of authority, yet that the titles of landowners within* the level registered by the deputy *after the death of the principal was known*, were invalid."

The same may be remarked of the case of *Shipman* v. *Thomas*, Willes' Rep. 103, n. While the general rule is recognized, the exception is pretty clearly intimated. The action, in assumpsit, was brought by an executor, in his own name, against an attorney empowered by the testator to collect rents, to recover the money collected by the attorney from the tenants as such attorney, after the death of the testator, his principal. The following is the language of that part of the opinion which seems to recognize the doctrine in

question : " It is," says Mr. Fortescue, " quite a new debt created by the defendant to the executor since the death of the testator, and a new cause of action which was not subsisting before. The defendant was never indebted to the testator for this money, and the original debtors, the tenants, were discharged." But very obviously the tenants were *not* discharged if the attorney, so appointed by the principal in his lifetime, had not authority to receive and the tenants to pay, by virtue of the agency, after the death of the principal. It may, therefore, be presumed that the tenants paid their rent to his attorney in ignorance of the death of the principal.

The next case cited in support of Chancellor Kent's proposition, is that of *Watson* v. *King*, 4 Comp. N. P. Rep. 272; and that case also, it will be perceived, presents only the general rule of revocation by death, and that of a power coupled with an interest being irrevocable. Besides, in that case, Ward, having sold under a power of attorney, is presumed to have indorsed the register in *Maxwell's name*. And if so, it must have necessarily been void, the same as would a deed executed in like manner, for the conveyance of land. Lord Ellenborough delivered the opinion, and expressed no qualification of the opinion which he had before delivered in the case of *The King* v. *Corporation of Bedford Level*, already referred to.

Again, in the case of *Tate* v. *Hilbert* (2 Vesey, jr. 117), the distinction between acts done before and acts done after the death of the principal *was known*, is clearly recognized. The facts in that case, relevant to this question, were briefly as follows : Mark Bell, shortly before his death, told his friend, Mary Tate, that he would give her £200, and thereupon gave her a check upon his banker, who then held £800 of his money, in this form: " Pay to self or bearer £200, Mark Bell." The check was not presented until after the death of the testator was known to the parties. Chancellor Loughborough, in delivering his opinion in the case, said : " If she had received it immediately after the death of the

testatator, and before the banker was apprised of it, I am in
clined to think no court would have taken it from her."

As to all those English authorities referred to in support
of the views expressed by Chancellor Kent, that "this equit-
able principle does not prevail in the English law," it would
be sufficient to show that the authorities do not *deny* its exist
ence; but the authorities will be found in fact to *recognize* its
existence to the extent and in the manner above mentioned.

It can not be pretended that any of those cases referred to
by Chancellor Kent are directly in point upon the contro-
verted question; and I do not know of more than two or
three cases in the English reports where the question of the
obligatory character of the acts of the agent done after the
death of the principal, and without notice, arose, so as directly
to present the question under consideration. The case of
*Blades* v. *Free, ex'r of Clark*, 9 Barn. & Cress. 167, was de-
cided in king's bench in 1829. It was an action of assump-
sit. The opinion of the court is thus expressed by the syl-
labus: " When a man, who had for some years cohabited with
a woman who passed for his wife, went abroad, leaving her
and her family at his residence, and died abroad—Held:
That the woman might have the same authority to bind him
by her contracts for necessaries, as if she had been his wife,
but that his executor was not bound to pay for any goods
supplied to her after his death, although before information
of his death had been received."

But in that case, the counsel of the plaintiffs thus stated
the question submitted to the court: " The question is,
whether Clark may not be taken to have agreed, before he
left England to pay for such goods as were furnished before
notice of his death was received." It appears, therefore,
although the facts of the case fairly presented the question,
it was not presented or argued by counsel, or considered by
the court.

But in the argument of the case, counsel thus refer to a
decision made by Lord Kenyon: "Now, although an au-
thority may be revoked by death, a contract can not. In
*McDonnell* v. *McDonnell* (Buck. 399), it was held that bank-

ruptcy did not make void the acts done under a power of attorney previously given by the bankrupt; and in that case the vice-chancellor cited a case tried before Lord Kenyon, where a power of attorney had been sent out to India, and certain acts were done under it there, after the death of the principal, but before notice of it, and Lord Kenyon supported those acts.

. The other English case is that of *Smout* v. *Ilberry* (10 Meeson & Welsby, 1), decided in the court of exchequer in 1842. Action of debt, for goods sold and delivered. Plea, *non debit*. It appeared on trial that the plaintiff was a butcher, and the defendant the widow of James Ilberry, who left England for China in May, 1839, and was lost in the outward voyage, on the 14th of October, 1839. The news of his death arrived in England on the 13th of March, 1840. The plaintiff had supplied meat to the family before Mr. Ilberry sailed, and during his voyage, down to the time of the news of his death, and even afterward. Upon the day of his death, the amount of the debt was £52 13s. 11d. Between the day of his death, and the news of his death, the meat had been supplied to the amount of £19 9s., and after that to the amount of £6 7s. The action was brought for the last two sums. The defendant had tendered and paid into court the last named sum. The court held, as to the £19 9s., that a recovery could not be had by the plaintiff upon these facts. In their opinion the court say : " Here the agent had in fact full authority to contract, and did contract in the name of the principal. There is no ground for saying, that in representing her authority as continuing she did any wrong whatever. There was no *mala fides* on her part. * * * We were, in the course of the argument, pressed with the difficulty, that if the defendant be not personally liable, there is no one liable on this contract at all; for *Blades* v. *Free*, 9 Barn. & Cress. 167 ; 4 Man. & Ry. 282, has decided that in such a case, the executors of the husband are not liable. This may be so ; but we do not think, that if it be so, it affords to us any ground for holding the defendant liable. *

* * * Our judgment, on the present occasion, is founded on the general principles applicable to all agents," etc.

It will be perceived that this case very clearly questions the correctness of *Blades* v. *Free;* and it is certain that both can not stand as law, consistently with the interest of commerce and public policy. For it is expressly said, in this latter case, that the "judgment is founded on the general principles *applicable to all agents.*" That is in *all cases* where an agent has contracted a debt in good faith, within the scope of his agency, after the death of the principal, *in ignorance* of his death, the agent *is not liable.* If both cases, therefore, be *law*, the creditor is utterly remediless. I can not think it possible, that in a commercial nation, like England, such has been the rule of the common law, which for centuries has been termed, "the perfection of reason."

In my former reference to the English authorities, I referred to several that I have not here mentioned. But I maintain, that the weight of the English authorities from Littleton down to the present time, will be found in favor, rather than opposed to the doctrine here insisted upon. I think, moreover, there is an argument to be derived in favor of the rule having been in early times recognized in England, as existing at common law, from the *absence* of any statutory enactment establishing such a rule. And more especially so, since, under the bankrupt act of 13 Elizabeth, ch. 7, constituting a rule analogous to that insisted upon by my brethren who differ with me, such legislation was then found necessary. For the necessity would have much sooner arisen there, in the case of agency, under which, transactions would arise showing such necessity with tenfold the frequency that they could in the case of bankruptcy.

Let us for a moment recur to the English statutes, referred to as illustrative of the argument.

Although the granting of commissions of bankruptcy is said to have its origin and to have prevailed very early under the civil law, and that it was there usual to constitute a guardian to a prodigal in the same manner as to an insane man, the practice was only first introduced into England, by

statutes (34 Henry 8, ch. 4), passed by parliament in 1542; entitled " an act against such persons as do make bankrupts." That act provides as follows :

" Where divers and sundry persons, craftily obtaining into their hands great substance of other men's goods, do suddenly flee to parts unknown, or keep their houses, not minding to pay or restore to any their creditors their debts and duties, but at their own wills and pleasure consume the substance obtained by credit of other men, for their own pleasure and delicate living, against all reason, equity, and good conscience; be it, therefore, enacted by authority of this present parliament, that the lord chancellor of England, or keeper of the great seal, the lord treasurer, the lord president, lord privy seal, and other of the king's most honorable privy council, the chief justices of either bench for the (time) being, or any three of them at the least, whereof the lord chancellor, or keeper of the great seal, lord treasurer, lord president, or the lord privy seal to be one, upon every complaint made to them in writing by any parties grieved concerning the premises, shall have power and authority, by virtue of this act, to take by their wisdoms and discretions, such orders and directions, as well with the bodies of such offenders aforesaid, wheresoever they may be had, or otherwise, as also with their lands, tenements, fees, annuities, and offices which they have in fee simple, fee-tail, term of life, term of years, or in the right of their wives, as much as the interest, right and title of the same offenders shall extend or be, and may then lawfully be departed with by the said offenders, and also with their money, goods, chattels, wares and merchandises, and debts, wheresoever they may be found or known, * * * * and to dispose of the same for the benefit of the creditors," etc.

I have thus set out at length so much of this act as is sufficient so show that the commissioners could not acquire any title or right, by relation, to any property of the offender already conveyed and parted with by him to a *bona fide* purchaser.

But in the act of 13 Eliz., ch. 7, entitled " an act touching orders for bankruptcy," amendatory of the act of 34 H. 8,

ch. 4, it was provided, " That if any merchant, or other person, using or exercising the trade of merchandise, by way of bargaining, exchange, rechange, bartry, chevisance, or otherwise, in gross or by retail, * * * sithence the first day of this present parliament, hath or at any time hereafter shall depart the realm, or begin to keep his or her house or houses, or otherwise to absent him or herself, or take sanctuary, or suffer him or herself willingly to be arrested for any debt or other thing not grown or done for money delivered, wares sold, or any other just or lawful cause, or good consideration or purposes, hath or will suffer him or herself to be outlawed, * * * to the intent or purpose to defraud or hinder any of his or her creditors * * * of the just debt or duty of such creditor, * * * shall be reputed, deemed and taken for a bankrupt." And, after providing that the commissioners might seize and sell the bankrupt's lands, and goods, and credits, it is provided by the act, " that such sale shall be good and effectual in the law, to all intents and purposes, against the said offender or offenders, * * * and against all other person or persons claiming by, from or under such offender's debtor or debtors, by any act or acts had, made or done, after any such person shall become bankrupt as aforesaid," etc. And from this language of the last-mentioned act, it seems to have come to be claimed that the act of bankruptcy rendered the title of a *bona fide* purchaser from the bankrupt, after the act, and without notice, utterly void. And thereupon, to preclude a rule so manifestly opposed to every one's sense of justice and right, there was enacted the act of 19 Geo. 2, ch. 32, entitled " an act for amending the laws relating to bankrupts," in which it is provided that, " Whereas, many persons within the description of, and liable to the statutes concerning bankrupts, frequently commit secret acts of bankruptcy, unknown to their creditors and other persons with whom, in the course of trade, they have dealings and transactions, and after the committing thereof, continue to appear publicly, and carry on their trade and dealings, by buying and selling of goods and merchandises, drawing, accepting and negotiating bills of exchange, and paying and

receiving money on account thereof, in the usual way of trade, and in the same open and public manner as if they had not become bankrupt; and whereas, the permitting such secret acts of bankruptcy to avoid and defeat payments really and *bona fide* made in the cases and under the circumstances above mentioned, when the person receiving the same had not notice of, or were privy to, such person's having committed any act of bankruptcy, will be a great discouragement to trade and commerce, and a prejudice to credit in general; be it, therefore, enacted by the king's most excellent majesty, and by and with the advice and consent of the lords spiritual and temporal, and commons in this present parliament assembled, and by the authority of the same, That from and after the twenty-ninth day of October, in the year of our Lord one thousand seven hundred and forty-six, no person who is or shall be really and *bona fide* a creditor of any bankrupt, for or in respect of goods really and *bona fide* sold to such bankrupt, or for or in respect of any bill or bills of exchange really and *bona fide* drawn, negotiated or accepted by such bankrupt, in the usual and ordinary course of dealing, shall be held to refund or repay to the assignee or assignees of such bankrupt's estate, any money which, before the giving forth of such commission, was really and *bona fide*, and in the usual and ordinary course of trade and dealing, received by such person of any such bankrupt, before such time as the person receiving the same *shall know, understand, or have notice* that he is become bankrupt, or that he is in insolvent circumstances," etc.

But it is evident that the same evil so existing in the case of a revocation of power to sell or transact business by an act of bankruptcy, if this equitable doctrine did not obtain at common law, must have always existed in the case of revocation by death, in regard to transactions with agents. Yet we find that no act of parliament seems to have been thought necessary in the latter case. And yet, if transactions under an agency, in good faith, after the death of the principal, and in ignorance of the event, were really held void at common law, the evil, in the case of agency, would recur much more

frequently, and the necessity of legislation be much more apparent for its removal, in the case of transactions by an agent, *after death,* than those *after bankruptcy.* The inference, therefore, certainly is, that if the evil had existed in both cases, legislation for its removal would have extended to both. Inasmuch, therefore, as we find legislation for the removal of the evil only extended to the case of bankruptcy, in which its occurrence was less frequent, if it existed in the other case at all, the natural inference is, that the evil did not, in fact, exist in the other case; and that *bona fide* transactions by agents, after the unknown death of the principal, were not held void at common law.

But it has been suggested that, after all, the opinion expressed by Judge Story and Chancellor Kent, may possibly be reconciled; that Judge Story does not mean to be understood to draw the distinction between acts *in pais,* mentioned in sec. 152 of his work on Agency, and what he terms solemn instruments under seal, mentioned in sec. 148, and confessions of judgment, livery of seizin, fines and recoveries, etc., which, of necessity, must be in the name of the principal. And although the same instances are mentioned by Littleton and Coke, as those transactions which it is impossible for an agent to perform after the death of the principal, and the reasons which they render are applicable only to that class of transactions, still, it is said that an agent acting for the principal, strictly speaking, must be understood to do *all* acts in the *name* of the principal, except only where his power is *coupled with an interest.* Hence, it is claimed that the opinions expressed by Chitty, in his work on Com. and Man., and Russel, in his work on Brokers and Factors, in favor of the exception, apply only to cases where their powers are coupled with an interest.

However ingenious this argument may be, it seems to me utterly untenable. In the first place, the exercise of a power coupled with an interest, is *no exception* in fact. If a man has received the goods of another, under those circumstances of trust, to sell and apply the proceeds upon his own demand or claim, either in whole or in part, he has, in his own right,

a legal property in them, and has a right to execute the trust by sale, as absolutely as has a mortgagee; and the principal, if living, could not revoke his own contract in that regard.

But I do not understand that acts *in pais*, or simple contracts of sale and purchase, giving possession of property, personal or real, by an agent, must *necessarily* be done in the *name* of the principal. It is sufficient that they are done *for* the principal. Take, for illustration, the case of *Blades*, v. *Free*, and the case of *Smout* v. *Ilberry*. In both cases, the supplies were furnished to the family not in the *name* of the husband, but they were ordered by the wife as the agent, standing in the relation of his agent, and without using his name. And in the case of *Williams* v. *Millington* (1 H. B.), the auctioneer, who was employed to sell the goods at the house of his principal, was even suffered to recover the price in his own name, from one who carried away the goods after sold, without payment, under a count for goods sold and delivered. Indeed, it is well known that auctioneers, employed to sell property of others, whether *personal* or *real*, rarely use the name of the principal. Thus, in the case of *Bowen* v. *Morris*, 2 Taunt. 374, we find real estate belonging to a corporation sold at public auction by the mayor, as agent, and the sale held good, evidenced by a memorandum of the following tenor: " The above-mentioned premises, comprised in lot 35, were this day sold to David Bowen for £1000, subject to the conditions of the sale within mentioned; and David Bowen, the purchaser or highest bidder of the said lot, and Thomas Morris, Esq., the mayor of the said corporation, on behalf of himself and the rest of the burgesses and commonalty of the borough of *Caermarthen*, the vendors of the premises, do hereby mutually agree to perform and fulfill, on each of their parts respectively, the within conditions of sale." (Signed) " T. Morris, mayor; David Bowen." This contract of sale, from the foregoing memorandum, does not purport to be made in any other *name* than that of the agent, the mayor. But it does purport to be a sale by the agent *on behalf* of or *for the* proprietors, the principals. And it being made to appear that

the mayor was authorized to act as such agent, and that his acts were, as to said sale, afterward approved by resolution, duly made and entered, at a corporate meeting of the borough, held according to their charter, Mansfield, C. J., held that the contract was one " on behalf of the corporation," made by the mayor " merely as an agent," and that the contract was not obligatory upon the mayor personally,

But the distinction which I understand to be made, necessarily obtains and exists in sound reason. It is conceded that a deed of the principal can not be executed by his attorney, after the death of the principal, so as to be operative to transfer the title or interest of the principal, even when the same is made in good faith, and in ignorance of the death of the principal. · And this is for the reason that the *deed must be made in the name of the principal;* and the principal being dead, the deed, although *purporting* to be in the name of the principal, is in the *name of nobody* in existence at the time of its execution by the attorney.

But this insuperable objection, thus applying to deeds, does not apply to instruments not under seal. This distinction between sealed instruments, as deeds of conveyance, etc., and simple contracts, will be found recognized by the authorities, both English and American. I do not say the authorities are uniform upon this subject, nor that there can not be found quite a number of cases where the distinction has not been recognized, but the weight of authority and reason I regard as very clearly in support of the proposition. Among the authorities on this subject, see the following : *Andrews* v· *Estes and others,* 2 Fairfield, 267 ; *Townsend and others* v. *Corning,* 23 Wend. 435 ; in which it is decided, " that when the agent, as such, does an act *in pais,* though *in his own name,* or enters into a commercial or other contract, *not under seal,* without subscribing the name of the principal, the latter is bound by the act of the agent." See, also,. *Evans and others* v. *Wells & Spring,* 22 Wend. 324, to the same effect; and *Townsend and others* v. *Hubbard and Orcutt,* 4 Hill, 351 ; in which Chancellor Walworth, in pro-

40

nouncing the opinion, says: "In an agreement *not under seal*, executed by an agent in behalf of his principal, and where the agent or attorney is duly authorized to make the agreement, it is sufficient, as a general rule, if it appears in any part of the instrument, that the understanding of the parties was that the principal, and not the agent or attorney, was the person to be bound for the fulfillment of the contract."

So, too, in the case of *Mechanics' Bank of Alexandria* v. *The Bank of Columbia*, 5 Wheat. 326, it was expressly held that the acts of agents do not derive their validity from professing, on the face of them, to have been done in the exercise of their agency. But the court held that the liability of the principal depended upon the fact of the transaction having been done *for* the principal, by the agent, in the exercise and within the limits of the authority delegated to him by the principal. The action, in that case, was brought by the Bank of Columbia to charge the Bank of Alexandria, upon a check of the following tenor: "No. 18. $10,000 Mechanics' Bank of Alexandria, June 25, 1817. Cashier of the Bank of Columbia, pay to the order of P. H. Minor, Esq., ten thousand dollars." (Signed) "Wm. Paton, jr." The check was given in evidence, although it did not purport to be drawn by an agent of the Mechanics' Bank, on behalf of that bank; but its only mark of official character was the place where drawn; and testimony was admitted to prove the facts that Paton was the acting cashier, and Minor the teller of the bank, and that the check was in fact drawn by Paton, in his capacity as cashier, etc. And the transaction was held to be as obligatory upon the Mechanics' Bank as though the check had purported to have been executed by its agent, on behalf or in the name of the bank. See, also, *Bowen* v. *Morris*, 2 Taunt. 374, and 10 Wend. 271.

Indeed, it is usual for auctioneers, factors, brokers, and supercargoes and shipmasters, in their own name, or by their own acts, to sell or dispose of the property of their principal.

Nor does the power of disposition or sale necessarily rest upon the fact of the agent, in those cases, being clothed by

Ish *v.* Crane et al.

the principal, as has been suggested, with the legal or equit-able title of the principal. Indeed, the validity of a sale of the goods of a principal, after and in ignorance of his death, when thus fairly made by such agent under apparent authority, I presume to say, has been rarely questioned. And yet the very character of these agents is notice to all persons that they are not clothed with the legal title, and have not neces-sarily any personal interest in the property. While intrusted by the owner with the possession and disposal of the prop-erty, they are generally well known to have only an apparent but not real ownership of the property so intrusted to them by their principal. Nor can it be said that the authority of factors, or brokers, or supercargoes, or shipmasters, when so exercised in the sale or disposition of the property of their principal, after his death, in ignorance of the event, is valid, by reason of the authority being " coupled with an interest." The power of the factor to sell may be derived from the mere fact of the goods being consigned to him, or it may be an *express power* from the principal. And, in either case, the power is as ample and complete, without any interest on the part of the factor, as it would be if he had afterward made an advancement in regard to the goods, and for which he had a lien upon them. Besides, the interest of the broker or factor is seldom, if ever, an interest in the *thing itself*, in the particular article of goods of the principal on which the power of sale is to be exercised, which would authorize such agent to sell after the death of the principal was known. A mere interest in the proceeds of the sale, by the exercise of his power as agent, will not authorize its exercise after the known death of the principal. Indeed, the known death of the principal will even revoke the power of sale in the latter case, where the power to sell is only coupled with an interest in the *proceeds* of the sale, and not in the *thing* to be sold, although the principal, had he survived, could not have re-voked the power. And this doctrine seems to have been held in the case of *Hunt* v. *Rousmaniere.*

The difference of views between Chancellor Kent and Judge Story, upon this subject, I, therefore, regard as irre-

concilable. Judge Story evidently inclined to the opinion that all acts to be done *in pais*, in any other manner than in the *name* of the principal, as "solemn instruments under seal," etc., done in the scope of the agency, after and in ignorance of the death of the principal, would be valid.

But, independent. of adjudicated cases upon this question, I regard the analogies of the law very decidedly in favor of Judge Story's views, rather than those of Chancellor Kent.

The validity of a contract made for another person, so as to be obligatory upon him, would seem logically to depend, necessarily, upon the existing *authority* of the person so making the contract to act *for* the *other* in making the contract, at the time of making it.

Yet those maintaining either side of the question in controversy, agree in this, that the validity of the contract does not necessarily depend upon the existence of the agency, in fact, at the time of making the contract. It is admitted on both sides of the question, that the doctrine held in Harrison's case, as called, 12 Mod. Rep. 346, and *Howard* v. *Treadwell*, 1 Strange, 506, is sound law ; and that it is sufficient to charge the principal, while living, to show that the contract was made *for him, by one whom he had caused to be regarded as authorized by him to make the contract*, and to *be accounted as his agent, although not such in fact*. Thus, in the case of *Burd* v. *Kirk*, 11 N. H. Rep. 397, the court, recognizing this doctrine, held, that where an agency, constituted by writing, was revoked, and the written memorandum of his previous appointment still kept in the agent's hands, the principal was bound to a third person, who, on the strength of the memorandum, had accredited him as an agent, although he had in fact ceased to be such. And other cases, with much uniformity, in this country as well as in England, express the same doctrine. Nor is this doctrine confined to cases of revocation, in fact, of the authority of the agent by the principal. In the case of *Davis* v. *Lane*, 10 N. H. Rep. 156, this doctrine was held in regard to a revocation by operation of law. In that case it was held, that the authority

was suspended or revoked by the lunacy of the principal—an entire loss of mental power on the part of the principal. But it was also held, that if the principal had, by letter or otherwise, enabled the agent to hold himself out as having authority, and third persons had thereby been led to deal with him, as an agent, *not knowing of the lunacy*, the principal and those claiming under him were precluded from setting up such revocation, to avoid the agency, and the validity of the transaction on the part of the agent. And I am not aware that the law of this case has ever been questioned.

By what course of reasoning, then, or by what analogies of the law, can it be shown that the same doctrine is not equally applicable to a case of revocation by operation of law, resulting from the *death* of the principal, that is applicable to a revocation by operation of law resulting from the *lunacy* of the principal? Or how is it possible to show that the same doctrine, admitted to be applicable in all cases of *actual* revocation of the agency in regard to transactions with the agent, in ignorance of the revocation, is not equally applicable, under the limitations mentioned, to his transactions after revocation by operation of law, resulting from the death of the principal? I confess that I am utterly unable to perceive any reasonable ground of distinction between revocation by lunacy, and revocation by death, or between an actual revocation *in fact*, and a revocation resulting by operation of law, from the death of the principal, in such a case as the present.

From the nature of the case, a power conferred to make a deed, to be executed *in the name* of the principal, by the attorney empowered, must terminate on the *death* of the *principal*. So a judgment taken by an attorney duly authorized, if not taken until *after* the *death* of the principal, is *void* for the *same* reason. The principal is not *in esse* when the deed was *delivered* in the *first* case ; and when the judgment was rendered in the latter case. The *title*, the *fee* of the land, on the *death* of the principal having, *instanter*, passed to the *heir*, a *subsequent* making and delivery of a deed by the attorney so appointed by the principal, in *his name*, he being dead, would *necessarily* be *nugatory*. The deed of one *by attorney*

is not the deed of the *attorney* but of the *principal;* and if the principal be dead, the deed can not be *his* deed, and it does not purport to be that of any other, and so it is, in fact, the deed of *nobody.*

But there is a sensible difference between the acts of an agent who transacts business *for* his *principal,* which may be done *without deed,* and *in his name;* such are the cases of selling and delivering goods, making contracts for the purchase or sale of property, collecting debts, employing workmen, etc.

For instance, a man about to embark at New York for a distant country, writes back to his friend in this state—" I wish you, at once, to sell my assortment of goods to A. B. at $5000, also to C. D. my farm at $6000, half cash in hand, and the remainder, with interest, in five years, and give possession immediately to the purchasers." And upon the authority to sell thus given by the letter, the purchases are made by the respective parties to whom the sales are made, and possession given by the agent. Can it be possible that if it should be ascertained, perhaps not for years after, that the principal had, in fact, died the day before the sales were so made by the agent, that the sales should be held void? I think not.

In each and all of that class of cases, I hold that all acts done by the agent with a stranger, in good faith, under such apparent authority, are binding upon all parties, in interest, by the rules of the common law; as well as by the rules of the civil law.

In the case supposed; if the agent should be able, on the day of receiving the letter, to sell the goods on the terms prescribed; and should also sell and give possession of the lands, on the terms expressed in the letter, each of the contracts of sale so made by the agent would be alike valid, whether the principal had died the day after, or the day before the execution of the agency; provided the parties had no notice of his death. And I am confident that no well considered early English case can be found to the contrary. Common honesty in dealing, a regard to justice, and public

policy, which forbids unnecessary and unreasonable impediments to commerce, require, and always have required, that such should be the rule at common law, as well as under the civil law.

The act of an agent is binding upon the principal, not merely as in the case of a *deed* made by an attorney duly qualified, because it is *in the name of the principal*, and *his* deed; but because the business has been done *for the principal*, and at *his* instance, or by his *procurement*. And hence it is, that a principal and his representatives may be as absolutely bound by the acts of one still appearing to be an agent, after he has ceased to be so in fact, as before, and while actually being an agent. If one appoints and commissions another to act as his agent, while acting under the commission, the transactions are obviously binding upon the principal, for whom, and by whose procurement the transactions are had. But if the agent continues transactions after his commission has been revoked by the principal and without the knowledge or consent of the principal, he is not, in fact, the agent of the former principal; nevertheless, if the revocation of his authority be neither known nor implied, the transactions will continue obligatory upon the principal for whom he assumes to act as agent, the same as if authority had continued. And why, since the acts are by one not in fact an agent, nor authorized to act as such, should they be binding on the former principal, who has, perhaps, not only revoked his appointment, but has, for good cause, discarded him from service, and forbidden him to act in his behalf? The reason why the transactions should continue binding upon the former principal, as respects those ignorant of the termination of the agency is substantially the same that made obligatory upon the principal the transactions before the termination of the agency; to-wit, the transactions were by the procurement of the principal. He it was, who constituted him an agent, invited confidence to be reposed in him, as his agent, and thus procured, or caused others to deal with him as agent, until notified of the termination of the authority he conferred. And until this notice, it is well understood,

such termination in fact, of the relation of principal and agent, could not render invalid his transactions as agent with third persons.

Thus, too, it is said that an agency may be created by the representation of a party that the person making the contract is his agent, although, in fact, he is not. If such representation has occasioned one to give him credit, and contract with him as such agent, the party making the representation is bound by the transaction the same as if he had been, in fact, an agent, as represented. But the party is not, in either of these cases, bound as principal by virtue of the relation of principal and agent subsisting between himself and the person so contracting and accredited as his agent; for the relation in neither case, in fact, exists. But, in both cases, having himself caused him to be accredited as his agent, he is estopped from disputing the existence of the agency in the transaction. " Where one, by word or conduct purposely causes another to believe in the existence of a certain state of things," and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as in fact existing at the same time. In such a case it is that an estoppel *in pais* arises. And thus it is properly said, the representation of an authority is *quoad hoc* (by virtue of the doctrine of estoppel), precisely the same thing as a real authority given by the person to the supposed agent. The party having himself caused a person to be accredited as his agent is estopped from denying his agency in the two cases stated; and the rule is obviously sustained by justice, good reason and public policy. But in case of the agency being constituted by the principal, the agent commissioned and sent abroad by his principal, and performing his agency, with his written commission in hand, in good faith on his part, and in full confidence on the part of the person accrediting the written commission of the principal, it is said, if the agency do not in fact exist at the time of the transaction, if it has, in fact, terminated by the bankruptcy, the lunacy, or the death of the principal, unknown at the time of the transac-

tion, the representatives of the principal are not estopped, but may repudiate the credit and confidence which the principal has himself thus invited and occasioned. I do not so understand the law of estoppel. An estoppel is always binding, not only upon the party, but it is equally binding upon his heirs and representatives.

If the execution of this agency would have been binding on Crane if he had survived, so is it upon his heirs and representatives, since an estoppel is as binding upon the representative, heir or privy, as upon the party himself. It follows, therefore, that inasmuch as Crane himself, after so writing the letter constituting his cousin, James La Ferry, his agent, could not have denied the agency so by him constituted, if he had lived; neither can his representatives deny the agency by him thus constituted. The credit so given to La Ferry as agent, having been invited and caused by the act of Crane, by the letter so by him put into the hand of La Ferry, neither Crane, if living, nor his representative, he being dead, is allowed to repudiate the confidence so given his commission or letter, or to deny the agency thus accredited.

In such a case, therefore—a revocation by act of law—whether by bankruptcy, lunacy, coverture or death, precisely as in the case of actual revocation of the agent's powers, his transactions with persons dealing with him in good faith, as an agent, without notice of the revocation, are valid.

In this case, therefore, the agent having been duly empowered and requested by letter to sell the lands of his principal, and the plaintiff having thereby been induced to purchase the lands of him as the agent, in ignorance of the death of the principal, it is not permitted the representatives of Samuel Crane to repudiate the confidence so invited by him and reposed by the plaintiff, in the authority of La Ferry as such agent to sell said lands.

A decree must, therefore, be entered in favor of the plaintiff against the defendants.

BRINKERHOFF, J.—The leading question presented by this

case, and the case itself, was before this court, and was decided by a majority of the court, at December term, 1858, 8 Ohio St. Rep. 520. The question was then, for the first time, passed on by the court of last resort in this state.

If the decisions of the question elsewhere were uniformly concurrent, I should feel myself compelled to follow them, even if this involved the adoption of a rule which I regarded as essentially wrong in principle and unwise in policy, and to leave the remedy to the legislature. But when there is no authoritative decision of the question in Ohio, and there is a conflict among the cases abroad, I think we are at liberty to choose, and ought to adopt, the rule which seems best calculated always to secure just and equitable results.

The cases of *Cassiday* v. *McKenzie*, 4 Watts & Serg. 282, and *Dick* v. *Page & Bacon*, 17 Missouri, 234, are at least sufficient fairly to establish such a conflict.

From time immemorial, that which is known as the civil law rule has prevailed on the continent of Europe, and its adoption by us, therefore, will not be the inauguration of any untried experiment; and we need not, therefore, have any apprehensions that the rule will eventuate in injurious consequences, which we could not, on mere theory, anticipate. And it seems to me to be clear that this rule will always work out justice and right, while the so-called common law rule must always and frequently result in cases of terrible injustice and wrong; cases not exceptional in their character, but flowing naturally, necessarily and generally from the inherent viciousness of the rule itself. And of this there can be no better illustration than what is afforded by the case before us.

In South Carolina the civil law rule has been adopted by an act of legislation. But if we can properly adopt it without legislation, it is better to do so, because, as a rule of judicial action simply, it is more flexible, plastic, and capable of being molded, in i.s application to particular cases, as they arise, so as to work out the ends of justice.

For the reasons thus briefly stated, I concurred in the decision of this case heretofore made and reported, and now again concur in a judgment for the plaintiff.

SCOTT, J.—I also concur in rendering judgment in this case for the plaintiff, for the reason stated by Judge Brinkerhoff.

GHOLSON, J., dissenting.—Ordinarily I am content with a silent dissent; but believing that, in the present instance, there is a departure from the correct rule of decision, and a sacrifice of an old and established principle of the common law, to save from its operation a hard case, I feel it my duty to protest.

The general rule of the common law is admitted—that on the death of the principal the power of the agent ceases. But it is claimed that there is an exception, if the agent act before the death of the principal be known, and that this exception applies to such a case as the present.

Where there is a general rule or principle of law, the existence of which is admitted, it is incumbent on him who alleges an exception, to show precedent or authority for it, and if he can not, he has no right to engraft his exception. Until he shows authority for the exception, he has no right to ask for authorities against it; and if it be a case where, had the exception existed, there would have been numerous instances of its application, the absence of authority is conclusive. Such I understand to be the correct rule of decision; and this rule, in my judgment, has been violated.

The question has been treated as if the learned judges and commentators who have stated the rule as subject to no such exception, were bound to show authority, not only for the rule, but for the nonexistence of the exception. Thus, when Kent says—after stating the rule of the civil law, " that the acts of an agent done *bona fide* after the death of the principal, and before notice of his death, are valid and binding on his representatives,"—" that this equitable principle does not prevail in the English law; and the death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest"—the authorities he cites are regarded as unsatisfactory, because, though. fully sustaining the affirmative proposition, they do not, in-

terms, negative, the engrafting into the common law of the exception of the civil law*; a thing which, when speaking judicially, he said, had never been done. (7 G. C. R. 285.)

The fallacy in the reasoning upon which the former decision in this case proceeded, and I do not understand that any different ground is now taken, was in not distinguishing the power of an agent to do the act in his own name, from the manner of doing it in the name of his principal. In this case the act to be done was the making a contract for the sale of real estate. There may be two inquiries perfectly distinct: 1. Could the agent do such an act in his own name, and bind the principal? 2. In what mode might the authority be executed so as to bind the principal? Now, as to the first, it is clear that an agent appointed for such a purpose must do the act in the name of his principal, or for and on behalf of his principal, and can not do the act in his own name, and without reference to the authority under which he is acting. As to the second, it is equally clear that the stringent rule, as to the mode of executing a power by a sealed instrument, does not apply; but the mode, though it must appear to be in the name of the principal, may be shown to be so, in case of written instruments, by a fair interpretation, and, in some cases, parol evidence in aid of the writing may be received, to show that the act was really done, and intended to be done, in the name of the principal. Now, the confounding the rules of law on these points has led to the erroneous conclusion, that as to the revocation of authority by death, a distinction exists between acts of an agent by deed and acts done *in pais*, whereas the distinction in view of the writer from whom it was taken, was between acts which may be done in the name of the agent and acts which must be done in the name of the principal; and there is not a word in his book which can give color to the idea that such an act as the one under consideration can be done in the name of the agent.

A reference to the syllabus in the case, will show that the decision proceeded on this fallacy. After stating the facts in the case, it is held: "1. That the death of the principal, as a general rule, is a revocation of the agency, by operation of

law. 2. That the transaction being matter *in pais* and not by deed, or necessary to be done in the name of the principal, and being in good faith on the part of B. & C., and within the apparent authority of B., as so expressed by A., without knowledge of his death, the heirs and representatives of A. are estopped to deny such apparent authority of B., and the contract is obligatory upon them." 8 Ohio St. Rep. 520.

That the decision stands on the ground thus shown in the syllabus, is manifested still more clearly in the opinion. Thus it is said, the authorities go no further than " to hold absolutely void the acts of the agent, after the death of his principal, and without notice, which must *necessarily be done* in the name of the principal." Judge Story, it is said, is much more guarded and less positive as to the doctrine of the common law differing from the civil law than Chancellor Kent. Certain passages are quoted from his work on Agency —sections 495, 147, 148 and 150—and they are spoken of in reference to this question of the revocation of the authority of an agent by death, as having made a distinction, " between acts of an agent by deed and necessarily to be done in the name of the principal, and acts done *in pais*, not necessarily to be done in his name." Illustrations of the supposed distinction are given, and in conclusion it is said, referring to a case decided in Missouri, *Dick* v. *Page & Bacon*, 17 Misso. 234, " that the rule that the act of an agent done after the death of the principal, without notice, is void, only applies to those acts which must · be done in the name of the principal, and not to those acts which the agent may do in his own name. But the case under consideration is not one in which the acts of the agent could only be executed in the name of the principal. The agent, La Ferry, was not an agent to convey the title to the land, but only to negotiate a bargain with some one in relation to the conveyance." 8 Ohio St. Rep. 545.

In the case of *Dick* v. *Page & Bacon*, as well as in the former decision in this case, Story on Agency is relied on as the authority showing the distinction between acts which may be done in the name of the agent and acts which must

be done in the name of the principal. A reference to that work will show whether it can be properly described as " the distinction thus made between acts of an agent by *deed*, and necessarily to be done in the name of the agent, and acts *in pais*, and not necessarily to be done in his name." 8 Ohio St. Rep. 535. The 18th chapter of that work treats of " DISSOLUTION OR DETERMINATION OF AGENCY," and is perhaps the fullest and clearest statement of the rules of law on the subject anywhere to be found. In section 488, it is said : "A revocation may be by operation of law, by death, either of the principal or of the agent. This is an ancient and well settled doctrine of the common law. It will make no difference, that the power is declared in express terms to be irrevocable ; for if it be not coupled with an interest, although irrevocable by the party, it is revoked by his death. The doctrine seems to be a natural deduction or presumption of the actual intention of the parties. But it has this additional reason to support it, that, as the act must, if done at all, be done in the name of the principal, it is impossible that it can be properly done, since a dead man can do no act ; and we have already seen that every authority, executed for another, presupposes that the party could, at the time, by his personal execution of it, have made the act valid." And in section 489 he continues : " The only admitted exception in our law, if indeed that properly constitutes an exception, is the case where the power or authority is coupled with an interest in the thing, actually vested in the agent."

In subsequent sections reference is made to the rules of the civil law, and then follows, in section 495, the remarks which are supposed to show the distinction under consideration; and it is important in order to understand what is meant by acts which must be done in the name of the principal, to read what follows in immediate connection : " Regularly, indeed, where the act to be done must be done in the name of the principal, and not in that of the agent, the authority is extinguished by the death of the principal, because it has then become incapable of being so executed. And it should seem that this would be equally true in the Roman law, and in the

jurisprudence of continental Europe, under the like circumstances. The difference, on this subject, between our law and the latter, seems to rest, not so much upon a difference of principle, as upon the difference in the modes of executing the authority. Under the Roman law, the agent ordinarily executed his authority in his own name, and thereby bound his principal, indirectly, by his contract, *ex mandato*, and himself personally. An execution of the authority in the name of his principal was not generally allowed or required. In the jurisprudence of modern continental Europe, the rule of the Roman law would seem still to exist, so far, that the agent may bind the principal by the act done in his, the agent's, own name, *ex mandato*, although he is also at liberty to do the act in the name of his principal, in which latter case he may escape from any personal responsibility. This is certainly the doctrine in Scotland. Where the act, nothwithstanding the death of the principal, can and may be done in the name of the agent, there seems to be a sound reason why his death should not be deemed to be a positive revocation under all circumstances, and that a subsequent execution of it may be valid. But where the act is required to be done in the name of the principal, the same objection would seem to lie to it in the foreign law as does lie in our law. Now, our law recognizes this very distinction in its fullest force. In the case of an authority coupled with a vested interest in the thing, we have already seen that it is not extinguished by death of the principal, for the very reason that it can still be executed in the name of the agent, he having the vested legal and equitable title in the thing, which he can transfer or change by his own act, as owner. And it seems reasonable to believe, that the same doctrine would be fully recognized in our law, in all other cases of authority, where the act to be done may lawfully be done in the sole name of the agent. Thus, for example, a factor, as special owner of the goods may, and indeed usually does, sell them in his own name. So, a supercargo usually buys and sells in his own name. So, the master of a ship, in the usual course of exercising his authority, contracts in his own name, as *dominus*

*navis.* Thus, he purchases supplies, gives bottomry bonds, makes charter-parties, and sells the ship, in cases of necessity, in his own name; and these acts are constantly treated, when within the scope of his ordinary duties and employment, as binding upon his owner."

No other example is given, and it is said of all of them: " These cases seem, in truth, to be disposed of by the single consideration, that they either are, in fact, cases of powers coupled with an interest or are governed by the like analogy." In the next section it is said, the same doctrine is supposed to extend to insurance brokers; and then in section 498, it is said: " Whether, therefore, our law be so strict and rigid in its character, as to the implied revocation, resulting from the death of the principal, in cases where the agency can be, nay, ordinarily is and should be, executed in the name of the agent, and not of the principal (as has been often supposed), is a point, which may, perhaps, be entitled to farther consideration and examination than it has been thought hitherto to require."

It is difficult to understand, how it could be supposed, that the learned author contemplated, as coming within the description he has given, all acts *in pais* done by an agent, and particularly such a case as the making a contract for the sale of real estate. In this part of his book, which treats of the dissolution, or determination, of agency, not one word is said as to the difference between acts which an agent does by deed, and acts done *in pais* or in any other manner than by a written instrument, under seal. What he does say on that subject is under a different head—THE DUTIES AND OBLIGATION OF AGENTS, IN EXECUTING AUTHORITY (chap. 7)—which assumes that authority exists, and treats of the manner of its execution. It is under this head, that sections 147, 148, 150 and 152, cited in the former decision of this case, are found.

The idea, that this difference between the acts done by an agent controls in deciding upon the effect of a revocation by death, if entertained by Judge Story, would make inconsistent much of what he has written. Why say, it is doubted

whether our law deserves reproach for not being like the civil law, *at least to the full extent*, usually imputed, if all acts, done *in pais*, or in any other manner than by a written instrument under seal, are governed by rules similar to those of the civil law? Few cases would be left for what has been regarded as the rule of the common law, for though the authority may be conferred by deed, in most of the cases in which this is done, the acts of the agent under the authority may be *in pais*, or by writing not under seal. The very limited number of cases, in which a sealed instrument is required, such as the conveyance of real estate, would be left for the operation of the general rule. Why does he say, it is a point worthy of inquiry, whether "in cases, where the agency can be, nay, ordinarily is, and should be executed in the name of the agent, and of the principal," "our law be so strict and rigid in its character, as to the implied revocation resulting from the death of the principal?" Or why give as the only examples of such cases, the acts of factors, supercargoes and masters of ships, and say of them, that they either are, in fact, cases of powers, coupled with an interest, or governed by the like analogy, if all acts of agents, other than those by an instrument under seal, were intended to be described. Surely it can not be that Judge Story sanctions any such distinction, and the inference drawn from what he says in section 152, is not correct. This is shown by what follows in the same section, but was not quoted in the former decision in this case, and very clearly by subsequent sections under the same head.

Indeed, in view of the conclusive authority of these sections, I do not understand it to be claimed, that the agent in this case could do the act in his own name without any reference to the authority under which he was acting. But if I understand the opinion just delivered, it is conceded that it must appear that the act was done for, or on behalf of the principal, and the distinction relied on is, that it need not be done in the name of the principal. Now, when the common law authorities say, that a valid act can not be done in the name of a dead man, it would be drawing an exceedingly

41

fine distinction to claim, that a valid act may be done for, or
on behalf of, a dead man.   The reason which precludes the
propriety of the one, certainly extends to the other.   The
idea, that the reason of the rule under consideration, as ex-
pressed in all the authorities, and so clearly stated in the
quotation before made from Story, that a valid act can not
be done in the name of a dead man, is limited to cases of the
execution of sealed instruments, and allows acts to be done
for, or on behalf of, a dead man, is, so far as my research
has extended, and as I think, beyond any doubt, for the first
time advanced in the decisions of this case, and is unsustained
by any authority.

The case of *Dick* v. *Page & Bacon,* 17 Misso. 234, in the
decision of which the distinction really intended by Judge
Story was applied, shows that it was not supposed to have
the very extensive operation which is claimed in this case.
The court there, after referring to the distinction, and citing
the work on Agency, as authority, say : " In the case under
consideration, the notes left with Page & Bacon were in the
possession of Nicholson.   He could impart an equitable interest
in them without using the name of Doughty.   Page & Bacon,
to maintain their defense, insist on no act of the agent in the
name of the principal.   Nicholson may be regarded as a factor
of Doughty, with authority to pass the notes by delivery, so as
to warrant Page & Bacon in receiving the money due on them."
(17 Misso. 237.)   That the distinction has no such operation
is shown by the full passage from Russell on Factors and
Brokers, a part of which is quoted in the former decision in
this case.   The whole passage is : " Again, the death of the
principal will operate as a revocation of the authority of the
factor or broker to do any act merely as the agent of the
former, because, as has been well said, a valid act can not be
done in the name of a dead man.   But where the factor or
broker has authority to do an act in his own name, there it
would seem that the death of the principal will not *ipso facto*
determine such authority ; and a *fortiori* will this be the case,
if the authority conferred on the principal be coupled with
an interest ; because, in this latter instance, the factor or

broker would seem to act in his own behalf, so far, that is, as his interest extends, and not merely as the agent of his principal." This author cites Story as his authority for the distinction, and certainly does not understand him as referring to a distinction between acts by deed and acts *in pais*. It is scarcely necessary to say, that in none of the cases which have been decided on this subject of the revocation of an agency by death, though the point involved would have been at once and readily resolved by the application of such a distinction had it been taken by counsel or mentioned by the court. If negative evidence can show that an alleged proposition is not law, such evidence appears to be conclusive in this instance.

Even in the case of *Cassiday* v. *McKenzie*, 4 Watts & Serg. 282, which is said by the learned commentators on American Leading Cases, 1 vol. 587, to be in opposition to all the authorities, no distinction between acts in deed and acts *in pais*, as bearing on the subject under consideration, is mentioned. The decision is placed on other grounds, and the principle of that decision does not embrace the present case. That was the case of a transaction fully consummated in ignorance of the death of the principal. The court say : " There is no act to be done. This money has been paid by the debtor, and received by the agent, in good faith ; and why should it not be good, when the authority is revoked by death, as it confessedly is, when expressly revoked by the principal in his lifetime ? Here the precise point is, whether a payment to an agent, when the parties are ignorant of his death, is a good payment." Now, the case of an executory contract presents a different question, and it is exceedingly questionable whether, in wise policy, even legislative authority should create an exception on account of ignorance of the death of the principal in cases of executory contracts.

Certain English cases are cited as being " in favor of the limitation or exception to the rule insisted on." I have carefully examined those cases, and they make a very different impression on my mind. The cases of *Knowles* v. *Luce,* Moor, 112, and *The King* v. *Bedford Level*, 6 East. 356, do

show that there is an exception where the agent, as said in the passage cited from Chitty on Commerce and Manufactures, is a *legal* agent, such as the steward of manor, acting under " color of authority which strangers could not examine," or, in other words, as an officer *de facto.* And this clearly appears from the remarks of Lord Ellenborough in *The King* v. *Bedford Level,* 6 East. 368, which were in reference to the acts of an officer, a deputy register, and he says, in conclusion of the doctrine of Manwood, C. B., in *Knowles* v. *Luce:* ". This doctrine of Manwood's seems no more than what was the law in the case of all judicial offices, when the interest of the officers determined on the demise of the crown; for, though in consideration of law, the commissions of the judges, etc., immediately determined on such demise, yet their intermediate acts, between the demise of the crown and notice of it, were good." Now, the very introduction of such reasoning shows that the "limitation or exception insisted on" in this case, was unknown to Lord Ellenborough. And it may be said, in conclusion, that if there are English cases which favor such a limitation or exception, they have escaped the attention of such learned commentators as Kent and Story, and of the counsel and judges who have argued and decided the recent cases in England, which very clearly recognize no such limitation or exception.

PECK, J., also dissented.